IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

|  |  |
|---|---|
| ATCHAFALAYA BASINKEEPER,<br>64200 L & L<br>Plaquemine, LA 70764<br><br>PUBLIC EMPLOYEES FOR<br>ENVIRONMENTAL RESPONSIBILITY,<br>962 Wayne Ave., Suite 610<br>Silver Spring, MD 20910<br><br>SIERRA CLUB and its DELTA CHAPTER,<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612<br><br>THE LOUISIANA CRAWFISH<br>PRODUCERS ASSOCIATION-WEST,<br>1020 Serrette St.<br>Henderson, LA 70517<br><br>HEALTHY GULF,<br>935 Gravier Street, Ste 700<br>New Orleans, LA 70112<br><br>RONALD M. NOWAK,<br>Falls Church, VA<br><br>MICHAEL J. CAIRE,<br>Pensacola, FL<br><br>HAROLD SCHOEFFLER,<br>Lafayette, LA<br><br>       *Plaintiffs,*<br><br>vs.<br><br>DAVID BERNHARDT, in his official<br>capacity as Secretary,<br>U.S. Dep't of the Interior,<br>1849 C St., N.W.<br>Washington, D.C. 20240<br><br>and | Case No. |

AURELIA SKIPWITH, in her official
capacity as Director,
U.S. Fish and Wildlife Service,
1849 C St. N.W. Room 3331
Washington, D.C. 20240

      *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Atchafalaya Basinkeeper ("ABK"), Public Employees for Environmental
Responsibility ("PEER"), Sierra Club and its Delta Chapter, the Louisiana Crawfish Producers
Association-West ("LCPA"), Healthy Gulf, Ronald M. Nowak, Michael J. Caire, and Harold
Schoeffler challenge the U.S. Fish and Wildlife Service's ("FWS") March 2016 delisting of the
Louisiana black bear (*Ursus americanus luteolus*) from the U.S. List of Endangered and
Threatened Wildlife under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.  See*
81 Fed. Reg. 13124 (March 11, 2016).

## INTRODUCTION

1.     This is an action for declaratory judgment and injunctive relief to remedy
violations of the Endangered Species Act ("ESA"), (16 U.S.C. § 1531*, et seq.*) and implementing
regulations (50 C.F.R. § 420.01, *et seq.*), and the Administrative Procedure Act ("APA") (5
U.S.C. § 551, *et seq.*).  These violations were caused by Defendants' actions in (1) removing the
Louisiana black bear from the U.S. List of Endangered and Threatened Wildlife, (2) removing its
legally designated critical habitat, and (3) failing to make the determinations to take these actions
based on the "best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

Plaintiffs are organizations and individuals whose interests have been adversely affected by FWS's March 2016 delisting of the Louisiana black bear.[1]

2.      At the time of the Louisiana black bear's listing as a threatened species under the ESA in 1992, the subspecies had been declining for the past 200 years and probably numbered fewer than 150 individuals.  The listing likely saved the bear from extinction.  However, failure to use the best scientific data available and reliance on faulty scientific assumptions erroneously led to the delisting of the bear despite the fact that it has not achieved recovery.  The delisting presents a continuing threat to the viability of the Louisiana black bear and its habitat.  Plaintiffs seek invalidation of the decision to delist the bear and remove its critical habitat designation, resulting in reinstatement of the listing and critical habitat designation, and reevaluation of the Recovery Plan criteria.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 2201 (authorizing declaratory relief), § 2202 (authorizing injunctive relief), 16 U.S.C. § 1540(c), (g) (ESA district court jurisdiction and citizen-suit provision), and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act).  Defendants' sovereign immunity is waived by 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.  Attorneys' fees and expenses, including expert witness fees, may be awarded under the ESA, 16 U.S.C. § 1540(g)(4), and under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

---

[1] This case is closely similar to a prior case filed on June 28, 2018, in the District Court for the District of Columbia, Civ. No. 18-cv-01547-JDB.  That case was dismissed without prejudice for lack of jurisdiction by an order dated February 27, 2020, ECF No. 40.  In accordance with Local Court Rule 3(a)-(b), Plaintiffs are filing a separate document listing and describing the prior action and a brief summary of the relationship between these cases.

4.     Plaintiffs have provided more than 60 days' written notice of the violations alleged herein pursuant to 16 U.S.C. §1540(g)(2).

5.     Venue lies in this judicial district pursuant to 16 U.S.C. § 1540(g)(3)(A) (where the violation occurs) and 28 U.S.C. § 1391(e) (actions against an officer or employee of the United States may be brought where a defendant resides, where the plaintiff resides, or where a substantial part of the events or omissions occurred).  The challenged delisting decision was taken by the U.S. Fish and Wildlife Service, Department of Interior, through its Louisiana Ecological Services Field Office; a substantial area affected by the delisting is within the Middle District of Louisiana.  Plaintiff Atchafalaya Basinkeeper is domiciled within the Middle District of Louisiana.

6.     Declaratory relief is authorized by 28 U.S.C. § 2201 and the Federal Rules of Civil Procedure (Fed. R. Civ. P. 57).  Injunctive relief is authorized by 28 U.S.C. § 2202 and the Federal Rules of Civil Procedure (Fed. R. Civ. P. 65).

## PARTIES

7.     Atchafalaya Basinkeeper ("ABK"), founded in 2004, is a 501(c)(3) nonprofit organization incorporated under the laws of Louisiana.  ABK works to preserve, protect, and restore the ecosystems and wildlife habitat of the Atchafalaya Basin for future generations. ABK is a proud member of Waterkeeper Alliance, an international grassroots advocacy organization of over 350 programs working to protect watersheds across the globe.  Locally, ABK works to protect the long-term health and sustainability of the Atchafalaya Basin.  ABK has over 1,500 members, including members who live in the Atchafalaya Basin, who work in the Basin, and who recreate and enjoy the diverse ecosystems represented in the Basin, including by observation of the Louisiana black bear.  Dean Wilson has served as the Executive Director,

4

member, and appointed Basinkeeper of ABK since its inception in 2004. Mr. Wilson is a 30-year resident of Plaquemine, Louisiana in Iberville Parish and within the Atchafalaya Basin.  Mr. Wilson is also the owner of Last Wilderness Swamp Tours.  The bear's presence and habitat in the swamps creates a major draw for ecotourism in the Basin, and therefore supports Mr. Wilson's business.

8.      Healthy Gulf is a 501(c)(3) nonprofit organization headquartered in New Orleans, Louisiana.  Healthy Gulf's organizational purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of overexploitation of the Gulf's natural resources. Healthy Gulf has members and supporters who live, work, and recreate across the five Gulf states of Louisiana, Texas, Mississippi, Alabama, and Florida, and nationwide.  Healthy Gulf's members and supporters use the Atchafalaya Basin for recreation and value it as part of the natural and cultural heritage of this region.  This nationally significant resource supports boating, fishing, hunting, and birdwatching due to the size and quality of its wetlands.  The Basin provides habitat for wildlife requiring large connected blocks of forest such as the Louisiana black bear, an iconic subspecies that attracts our members, supporters, and the general public seeking to view the bears, and also researchers who study them.  Healthy Gulf's members visit the Basin to kayak, fish, and view wildlife, including black bears, and its membership actively supports our efforts to resist activities that would harm the Louisiana Black bear and its habitat.

9.      The Sierra Club is a national nonprofit organization with 67 chapters and more than 802,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human

environment; and to using all lawful means to carry out these objectives.  The Delta Chapter of the Sierra Club has approximately 3,500 members in the state of Louisiana, whose recreational, aesthetic, business, and environmental interests have been, are being, and will be adversely affected by the delisting of the Louisiana black bear.  Members of the Sierra Club live, work, and recreate in the area around the Atchafalaya Basin, and use its waterways and the surrounding areas for recreation, scientific study, fishing, and a variety of other activities, including observation and study of the Louisiana black bear.

10.     Plaintiff Public Employees for Environmental Responsibility ("PEER") is a 501(c)(3) nonprofit organization incorporated in Washington, D.C.  PEER's organizational purposes include assuring the enforcement of federal and state laws aimed at protecting endangered and threatened species and ensuring the use of adequate scientific research, analysis, and data in agency decision-making.  PEER has members/supporters who engage in scientific study of the Louisiana black bear and who enjoy observing it in its natural habitat.

11.     The Louisiana Crawfish Producers Association-West ("LCPA") is a nonprofit organization incorporated under the laws of Louisiana.  LCPA works to protect the economic, environmental, and cultural interests of the Atchafalaya Basin and its residents and to promote a healthy habitat for the crawfish, fish, and other wildlife that the Basin supports.  LCPA also works to protect public access to the waters of the United States within the Basin and ensure that state and federal laws intended to preserve and enhance the Basin's wetlands and waterways are followed.  LCPA has approximately 500 members, including recreational and commercial fishermen, hunters, and recreationists who live, work, and recreate in and around the Basin. These members regularly use the Basin in pursuit of these interests, including areas impacted by the 2016 delisting of the Louisiana black bear and removal of its critical habitat designation.

12.     LCPA member and President Jody Meche is a third-generation Cajun crawfisherman who has been making a living in the Basin his entire life.  Meche, like many members of LCPA who were born and raised in the Basin with Cajun heritage, has a spiritual and cultural interest in preserving the Louisiana black bear and its wild habitat.  Many LCPA members, including Meche, have and will continue to rely on the same ecological systems as the Louisiana black bear, including healthy wetland forests and water quality.  LCPA members have long observed and captured on game cameras the presence of the black bear across the Basin.  LCPA's members intend to continue using the Basin to advance their economic, recreational, cultural, spiritual, and aesthetic interests, including bear sightings in the Basin and protection of unique swamps and wetland forests that provide habitat for the Louisiana black bear.

13.     The March 2016 delisting of the Louisiana black bear has harmed the interests of ABK, the Sierra Club and its Delta Chapter, Healthy Gulf, PEER, and LCPA (the organizational plaintiffs) and their members.  Many of these organizations' members work, live, and recreate across the Atchafalaya Basin and the Tensas River Basin, and in doing so rely on the same habitat features that enable the bear to survive, including clean water and healthy wetland forests and cypress-tupelo swamps.  For decades, these members have personally experienced and observed the devastation of healthy wetland forests in the Atchafalaya Basin from unsustainable logging, permitted and unpermitted development projects, and unmitigated noncompliance and failures to enforce environmental laws.  During the seven-year critical habitat designation for the Louisiana black bear, including 567,316 acres of wildlife habitat in the Atchafalaya River Basin, the ESA afforded additional federal protection from adverse modifications to the critical habitat area.  The delisting decision and removal of critical habitat has removed those protections and once again made these irreplaceable wetlands more vulnerable to irreparable harm.

14.    The delisting impacts the protections for Louisiana black bears located around the Atchafalaya River Basin and the ecosystems they depend on, which has repercussions on ecotourism, commercial fishing, hunting, and the long-term health of the Basin's wetland ecosystems, including the Louisiana black bear subspecies and its habitat.  The delisting removed Louisiana black bear critical habitat designations that afforded procedural and substantive federal protections against adverse modification of Louisiana black bear habitat. During the period the bear was listed, these areas were more protected from development projects that impair bear habitat and surrounding wetlands.  The organizational plaintiffs and their members have recreational, aesthetic, conservational, and scientific interests in specific locations within the former designated critical habitat, and throughout the entire Basin.  New development authorized without federal scrutiny under the ESA in former critical habitat – filling in wetland habitat, disrupting water flow and quality, impeding navigation, and adversely impacting wildlife and its habitat – detrimentally impacts the traditional livelihoods of Cajun and other commercial fishers and hunters, as well as swamp tour businesses and recreational tourism.

15.    Moreover, the delisting's removal of critical habitat and reliance on inadequate regulatory mechanisms and habitat "protections" opens the door to more adverse development, impairing the unique hydrologic and ecological systems in and beyond the Basin, the productivity of Louisiana's wetlands, and the long-term sustainability of these irreplaceable natural resources.  Present and future destruction of wetland forests within and around the Atchafalaya Basin degrades breeding and connective habitat for the Lower Atchafalaya River Basin population of Louisiana black bears.

16.    ABK, Sierra Club and its Delta Chapter, Healthy Gulf, PEER, and LCPA have standing to bring this lawsuit because they are organizations whose members would have

standing to sue on their own and because the interests at stake are germane to the organizations' purposes, as set out above.  The delisting of the Louisiana black bear harms these organizations' members' scientific, educational, economic, conservational, recreational, and aesthetic interests by subjecting the bear and its habitat to present and future harms caused by the erroneous delisting of the bear.  Neither the claims asserted nor the relief requested in this case require the participation of any of the organizations' individual members.

17.    Ronald M. Nowak is a Louisiana native and current resident of Virginia, who has spent much time in Louisiana and elsewhere gathering information on the Louisiana black bear. He is also a member/supporter of plaintiff PEER.  He is a Ph.D. biologist and has authored 11 books on mammals, mostly with Johns Hopkins University Press, several of which discuss the Louisiana black bear.  He was staff mammalogist at the Office of Endangered Species, U.S. Fish and Wildlife Service, from 1974 to 1987, during which time, as part of his duties, he did several surveys and reports on the Louisiana black bear and other kinds of bears.  Prior and subsequent to that time, he also was contracted by the Service to do studies of wolves and cougars.  He makes periodic visits to Louisiana, where he attempts to observe and study the Louisiana black bear and its habitat, and his enjoyment and ability to conduct scientific studies on future visits would be diminished if the subspecies were to be reduced in numbers or distribution or if it were to undergo hybridization with an alien subspecies.  Potential conservation measures that would result from returning the Louisiana black bear to the U.S. List of Endangered and Threatened Wildlife, re-designating its critical habitat, and protecting its genome from further hybridization would greatly enhance his plans for additional study and observation.

18.    Michael Jordan Caire, MD, was a lifelong resident of Louisiana until his recent retirement.  He now resides in Florida near his grandchildren, but still owns property in northeast

Louisiana.  He is a member of the Sierra Club, and has been an active advocate for the survival

of the Louisiana black bear for over thirty years.  He received a degree in zoology from the

University of North Carolina Chapel Hill and his MD from Louisiana State University Medical

School in New Orleans, and is a retired Fellow of the American College of Obstetrics and

Gynecology.  He has expertise and experience in evaluating the best available science, and in

interpreting scientific data and expert opinions.  Dr. Caire is a life member of the former Black

Bear Conservation Coalition, which while active was dedicated to promoting the restoration of

the Louisiana black bear in its historic range.  Today, Dr. Caire is concerned by the egregious

conduct in delisting the Louisiana black bear and its harmful impacts, including the abandonment

of the most genetically unique and most endangered population of Louisiana black bear in

coastal Louisiana.  He has received several awards for his work on the Louisiana black bear,

including the Louisiana Wildlife Federation Volunteer Conservation Award and the Chevron

Conservation Award.  Dr. Caire was active with the Tensas Conservancy Coalition, where his

work led to the purchase of the Tensas National Wildlife Refuge ("NWR") and the adjacent Big

Lake Wildlife Management Area, which are the core habitats of the present Louisiana black bear

population of the Tensas River Basin.  Dr. Caire has been mentioned in the Congressional

Record citing his work in the establishment of the Tensas NWR and in the protection of the

Louisiana black bear.  Dr. Caire has a long history of undertaking efforts to restore the Louisiana

black bear.  Dr. Caire has visited and will continue to visit his property in northeast Louisiana,

including property in Ouachita Parish near Darbonne NWR where a mature Louisiana black bear

and cub were recently captured on a game camera.  He also visits, and intends to continue to

visit, the Tensas NWR and Big Lake Wildlife Management Area where he enjoys outdoor

recreation, hunting, fishing, birdwatching, and observing the Louisiana black bear.  Dr. Caire's

involvement with the Louisiana black bear will continue into the future, as he intends to continue studying bear issues, including conservation, and visiting and observing bear habitat. Reversing the delisting would greatly enhance his plans for additional study and observation.

19.     Harold Schoeffler is a longtime resident of Lafayette, Louisiana, and an active member of plaintiffs the Louisiana Crawfish Producers Association-West and the Delta Chapter of Sierra Club. For over 30 years Mr. Schoeffler has been actively involved in efforts to conserve the bear and protect its habitat. In 1987, Mr. Schoeffler personally drafted a citizens' petition to have the bear listed under the ESA. In December 1991, nearly five years after the original petition was submitted to FWS without results, Mr. Schoeffler, Sierra Club, and Defenders of Wildlife initiated suit against the FWS to list the bear.[2] Ultimately, the case resulted in the Service finally listing the Louisiana black bear as threatened under the ESA. In 2005, Mr. Schoeffler and LCPA filed suit in the Western District of Louisiana to force the Secretary of the Interior to designate critical habitat for the Louisiana black bear.[3] As a result of the suit, in 2009 the FWS designated 1,868 square miles of critical habitat for the Louisiana black bear, including 567,316 acres in the Atchafalaya River Basin. An accomplished Scoutmaster who has led numerous camping trips in the Atchafalaya Basin, Mr. Schoeffler believes preserving the Atchafalaya Basin is vital to saving the bear because the region provides some of the bear's best remaining habitat. Mr. Schoeffler uses, and intends to continue to use, the Atchafalaya Basin on a regular basis, four or five days a week, for fishing, crabbing, canoeing, and hunting.

---

[2] *See Defenders of Wildlife, et al. v. Lujan,* 2:91-cv-04641-CS (E.D. La. 1991).
[3] *See Schoeffler and Louisiana Crawfish Producers Association-West v. Kempthorne*, 493 F. Supp. 2d 805 (W.D. La. 2007).

20.     The individual plaintiffs, Ronald M. Nowak, Michael J. Caire, and Harold Schoeffler, have standing to sue based on their personal, scientific, aesthetic, educational, conservational, and recreational interests in protecting, preserving, and restoring the genetically unique Louisiana black bear subspecies and its habitat. The erroneous and scientifically unsupported delisting decision particularly harms the scientific and personal interests of the individual plaintiffs whose commitment to the restoration of the Louisiana black bear subspecies led to its being listed in 1992 and has not since waivered.  The delisting's recovery finding relies heavily on the flawed implementation of the Recovery Plan, which facilitates interbreeding with an alien subspecies, significantly increases the risk of hybridization, disregards a significant population in the Lower Atchafalaya River Basin, and thus specifically harms the interests of the individual plaintiffs to protect, restore, and connect true Louisiana black bear populations.

21.     The recreational, aesthetic, conservational, and scientific interests of all the Plaintiffs are harmed by the current – and certain to continue unless the bear is relisted and management plans modified accordingly – hybridization of the Louisiana black bear subspecies by its ongoing genetic contamination through interbreeding with a different subspecies, the American black bear (*U. americanus americanus*). The ongoing interbreeding diminishes the Plaintiffs' ability to observe and study true Louisiana black bears.

22.      This genetic contamination is occurring because FWS's flawed Recovery Plan that supported the delisting relied on facilitating interbreeding between *luteolus* bears and *americanus* bears that had been trucked in from Minnesota in the 1960s, but had not previously interbred with *luteolus*.  The interbreeding occurred because the FWS relocated a group of native *luteolus* bears, mostly from the Tensas River Basin, to close proximity with the population descended from the imported *americanus* bears in the Upper Atchafalaya basin, as part of its

Recovery Plan implementation. Interbreeding between those groups has occurred and will continue after delisting unless the bear is relisted in accordance with the requirements of the ESA to protect the *luteolus* subspecies, as sought in this complaint.

23.    The Defendants have illegally treated the Minnesota bears as if they were the same as the Louisiana black bear subspecies for purposes of the subspecies' Recovery Plan and the delisting decision. If Plaintiffs prevail in this litigation and Defendants are required to properly follow the ESA, Defendants will be required to relist the subspecies and aim its Recovery Plan at recovering the *luteolus* subspecies. At a minimum Defendants will be required to protect the native subspecies and prevent further hybridization. Because the prior Recovery Plan implementation only addresses one true *luteolus* population (the Tensas River Basin ("TRB") population), assuming a revised Recovery Plan still calls for at least two interconnected populations of Louisiana black bear, Defendants will be required to enhance and protect at least one additional, non-Minnesota based, bear population, as well as conserve critical habitat for both populations.

24.    If at least one additional Louisiana black bear population was protected and recovered, and connectivity with another Louisiana black bear population established before any future delisting decision, the survival and abundance of true, non-hybridized Louisiana black bears would be substantially more probable. The result of Defendants' actions in promoting ongoing hybridization in its Recovery Plan implementation, and then relying on the Plan to delist the Louisiana black bear, has harmed the Plaintiffs by threatening *true* Louisiana black bear population numbers and persistence and causing direct harm to Plaintiffs' scientific, aesthetic, conservational, economic, and recreational interests in observing and studying the actual listed subspecies within its native habitat.

25.     Those interests are also threatened by the directly foreseeable future hunting seasons for Louisiana black bears that the Louisiana Department of Wildlife and Fisheries is likely to allow prematurely, before the subspecies is sufficiently recovered to allow ethical and sustainable hunting, as a direct result of the delisting and consequent removal of ESA take prohibitions.  Providing hunting opportunities is in the Department's Management Plan for the bear.  Many in this rare subspecies will be killed as a result.  Permitting hunting of the Louisiana black bear at present population numbers would be premature and harmful to the subspecies. Ethical hunting is not presently possible with such low population numbers where every individual is integral to the survival of this genetically unique subspecies.  Premature hunting will reduce its numbers and density, and will make the subspecies more afraid of humans ("gun shy"), thus directly reducing Plaintiffs' opportunities to observe and enjoy the bears, as well as to continue ongoing scientific studies of them.  Premature allowance of hunting will damage the subspecies and thus conflict with Plaintiffs' interests in eventual ethical hunting of the Louisiana black bear when true recovery in actually achieved.

26.     Individual and organizational plaintiffs have a long history of forcing the FWS to fulfill its mandatory duties to protect the Louisiana black bear and its habitat.  Forward progress towards Louisiana black bear recovery is in large part attributable to plaintiffs' ongoing efforts to conserve the Louisiana black bear and its habitat, when state and federal agencies dragged their feet.  However, recovery has not yet been achieved.  Actions by Defendants which disrupt and conflict with these efforts – including flawed Recovery Plan implementation, premature delisting of the subspecies, and removal of its critical habitat – directly harms plaintiffs and the Louisiana black bear's chances of future survival.

27.     Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior.  The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to mammals such as the Louisiana black bear. Defendant Bernhardt is sued in his official capacity.

28.      Defendant Aurelia Skipwith is the Director of the U.S. Fish and Wildlife Service, which has the direct responsibility for carrying out the ESA with respect to mammals such as the Louisiana black bear.  A prior Acting Director, James W. Kurth, signed the delisting decision at issue here.

## LEGAL FRAMEWORK

### The Endangered Species Act

29.     The purposes of the ESA include "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  The ESA achieves this goal by authorizing the Secretary of the Interior to determine "whether any species is an endangered species or a threatened species" as a result of habitat destruction, overutilization of the species, predation or disease, inadequate regulatory structures, or any other natural or manmade factors affecting the species' continued existence. § 1533(a)(1)(A)-(E).

30.     The term "species" under the ESA includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature," § 1532(16), such as the Louisiana black bear.

31.     FWS is also required to reconsider the classifications of species and change them if warranted based on new information. *See* § 1533(c)(1) (requiring FWS to revise the List of

Endangered and Threatened Wildlife "from time to time"). The status of each listed species must be reviewed every five years. § 1533(c)(2)(A), (B). In that review, the Secretary is to determine whether the species should be removed from the List, or changed from endangered to threatened, or from threatened to endangered. § 1533(c)(2)(B).

32.     Concurrent with making a determination that a species should be listed as endangered or threatened, the Secretary must also "designate any habitat of such species which is then considered to be critical habitat." § 1533(a)(3)(A).

33.     The ESA defines "endangered species" to include "any species which is in danger of extinction throughout all or a significant portion of its range." § 1532(6).

34.     The ESA defines "threatened species" to include "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." § 1532(20).

**Listing of Threatened or Endangered Species**

35.     The ESA also establishes standards by which the Secretary is directed to categorize a species. In making determinations as to whether a species should be listed as endangered or threatened, the action should be taken "solely on the basis of the best scientific and commercial data available." § 1533(b)(1)(A); *see* 50 C.F.R. § 424.11(b).

36.     Designations of critical habitat must also be based on the "best scientific data available." 16 U.S.C. § 1533(b)(2).

**Delisting of Threatened or Endangered Species**

37.     When the Secretary removes a species from the Federal Lists of Endangered and Threatened Wildlife and Plants, or "delists" a species, s/he is required to make a determination

that the threats that merited listing in the first place have been eliminated or controlled. *See* 16 U.S.C. § 1533(a) – (c); 50 C.F.R. § 424.11(d).

38.     Specifically, the factors to be considered for delisting are the same as those for listing: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms protecting the species or habitat; and (5) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1), (c); 50 C.F.R. § 424.11(c), (d).  The ESA dictates that the presence of any one of the five factors shall serve as the basis for protection of a species. 16 U.S.C. § 1533(a)(1) (determination to be made based on any of the five factors).

39.     A species may be delisted based upon considerations of these five factors <u>and</u> only if "the best scientific and commercial data" substantiate that it is no longer endangered or threatened for one of the following reasons: extinction, recovery, or if the original data underlying the listing are found to be in error. 50 C.F.R. § 424.11(d).

40.     To merit protection under the ESA, the species need not be endangered or threatened throughout all of its range if it is endangered or threatened in a significant portion of its range.  The fact that a species is viable in some portion of its range does not mean that the species as a whole is not threatened or endangered. 16 U.S.C. §§ 1532(6); 1532(20).

41.     The FWS promulgated a final policy to provide an interpretation and application of "significant portion of its range" in the ESA definitions of "endangered species" and "threatened species." 79 Fed. Reg. 37577 (July 1, 2014).  However, courts have since concluded that the policy is invalid. *Ctr. for Biological Diversity v. Jewell,* 248 F. Supp. 3d 946 (D. Ariz. 2017); *Desert Survivors v. U.S. Dep't of Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018).

42.     The ESA directs the Secretary to develop and implement "recovery plans" for the conservation and survival of endangered and threatened species, including subspecies and certain populations. 16 U.S.C. § 1533(f).  Recovery plans are to contain management actions to achieve the plan's goal for the conservation and survival of the species, and include criteria, which, when met, would result in a determination that the species should be removed from the List.  *Id.*

43.     However, as acknowledged in the delisting rule, recovery plans are not regulatory documents and cannot substitute for regulatory determinations and promulgations of regulations. The ESA has no definition or criteria for what constitutes "recovery."  Therefore, achievement of the goals of a recovery plan does not necessarily mean that the statutory standards for delisting have been met.

44.     The ESA provides that the rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553, apply to regulations promulgated under the ESA such as the delisting rule at issue here. 16 U.S.C. § 1533(b)(4).

### Citizen Suits under the ESA

45.      The ESA provides a private right of action in the form of citizen suits whereby individual citizens may bring suit against violators of the ESA or against the Secretary for failing to perform non-discretionary duties required by the ESA. *See* 16 U.S.C. § 1540(g).

46.     Any person may commence an action in district court to enjoin any person, including the government agencies, for violations under the ESA. § 1540(g)(1)(A).  The statute also provides for citizen suits when the Secretary fails to comply with the requirements of § 1533, which addresses determinations concerning the status of species as threatened or endangered.  16 U.S.C. § 1540(g)(1)(C).

## Administrative Procedure Act

47.     The Administrative Procedure Act ("APA") enables a person adversely affected or aggrieved by agency action to seek judicial review thereof.  5 U.S.C. § 702.

48.     Under the APA, a court will set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL ALLEGATIONS

49.     The Louisiana black bear (*Ursus americanus luteolus*) is one of 16 recognized subspecies of the American black bear (*Ursus americanus)*, which is the official state mammal of Louisiana and an iconic emblem of American culture and heritage.  While the black bear historically was found across North America, the Louisiana black bear subspecies is only known to have occurred in Louisiana, eastern Texas, southern Arkansas, and most of Mississippi.

50.     Compared to other American black bears, the Louisiana black bear's skull is relatively longer, narrower, and flatter, with large molar teeth.  *Luteolus* has been reported to be a relatively large subspecies of black bear. Adult males can weigh more than 600 pounds.

51.     Before large-scale human development, the Louisiana black bear is estimated to have had an overall range of at least 120,000 square miles, and to have numbered at least 80,000 individuals.  However, by the 1950s, only 80 to 120 Louisiana black bears were estimated to remain in Louisiana, and fewer than 25 were estimated to remain in Mississippi at the time of listing in 1992.  The Texas population had been exterminated.  Thus, well under one percent of historic numbers remained.

52.     On January 7, 1992, the Louisiana black bear was listed as threatened pursuant to the ESA.  57 Fed. Reg. 588 (January 7, 1992).  The listing was based primarily on the historical

modification and reduction of bear habitat, the reduced quality of the remaining habitat due to fragmentation, and the threat of future habitat conversion and human-related mortality. The listing decision stated that listing was warranted on the basis of past habitat loss alone.

53.     The listing decision found that suitable habitat for the Louisiana black bear had been reduced by 80 percent as of 1980, and that the remaining habitat was reduced in quality by fragmentation due to human activity, thereby stressing the remaining populations. Bottomland forest habitat was continuing to be cleared. It should be noted that while suitable habitat had been reduced by 80 percent, the bear itself had been eliminated from much of the remaining suitable habitat, so it actually was resident in only about two percent of its original habitat of at least 120,000 square miles.

54.     The listing decision also determined to list all other subspecies of the species *Ursus americanus* within the Louisiana black bear's range (Louisiana, Mississippi, and Texas) as look-alike species pursuant to the look-alike provisions of ESA. FWS noted that the region might have bears of the subspecies *Ursus americanus americanus*, descended from Minnesota animals that had been introduced within the range of the Louisiana black bear in the 1960s for sport hunting purposes. Those bears could not always be distinguished from the native subspecies, particularly in the field. FWS therefore expressed concern that it would be difficult to enforce protection of the Louisiana black bear from human-induced mortality, without also protecting the other subspecies.

55.     The listing decision noted that there was some controversy over whether the Louisiana black bear subspecies was validly distinct from other subspecies of black bears. However, FWS concluded that there was a morphological distinctiveness and that the Louisiana black bear was a valid subspecies qualified for listing. Specifically, FWS concluded in its 1992

listing of *U. a. luteolus* that "the only practical means available for protecting any possibly remaining unique genetic material originally belonging to the native *U. a. luteolus* would be through listing and protecting the taxon now distinguished by cranial features as *U. a. luteolus.*" 57 Fed. Reg. at 592. Although FWS reported at the time of listing that morphology supported the validity of *luteolus*, while genetic issues were unsettled, a later detailed genetics study by Laufenberg and Clark, funded in part by the FWS and the most oft-cited document used in developing the delisting, provided clear evidence that native populations of *luteolus* had maintained genetic distinction.[4] The 2016 delisting decision reaffirmed that FWS still considers the Louisiana black bear to be a distinct subspecies. Even if the Louisiana black bear (*luteolus*) were not recognized as a full species or subspecies, it would still be eligible for listing under ESA as a "distinct population segment." 16 U.S.C. § 1532(16).

56.     A recovery plan for the Louisiana black bear was issued on September 27, 1995. It contained four main recovery actions: (1) restoring and protecting bear habitat; (2) developing and implementing information and education programs; (3) protecting and managing bear populations; and (4) conducting research on population viability, corridors, and bear biology.

57.     The recovery criteria in the Recovery Plan included: two viable "subpopulations," one in each of the Tensas and Atchafalaya River Basins, immigration and emigration corridors between the two viable "subpopulations," and long-term protection of the habitat and interconnecting corridors that support each of the two viable "subpopulations."

58.     On March 10, 2009, the FWS published a final rule designating critical habitat for the Louisiana black bear. 74 Fed. Reg. 10349 (March 10, 2009). The FWS designated critical

---

[4] Laufenberg, J.S., and Clark, J.D., 2014, Population Viability and Connectivity of the Louisiana Black Bear *(Ursus americanus luteolus)*: U.S. Geological Survey Open-File Report 2014-1228, 104 pp., *https://dx.doi.org/10.3133/ofr20141228*.

habitat for the Louisiana black bear to protect core breeding populations and the highest quality

bear habitat from continued habitat fragmentation and anthropogenic mortality exacerbated by

habitat fragmentation.

59.    On February 18, 2014, FWS completed an extensive 5-year review of the status of

the Louisiana black bear that concluded the subspecies should remain listed as threatened.[5]

60.    Yet, just over a year later, FWS proposed delisting the Louisiana black bear. 80

Fed. Reg. 29394 (May 21, 2015).

61.    In the delisting proposal and in the final delisting rule, FWS recognized that the

Louisiana black bear, *Ursus americanus luteolus,* was a subspecies of the American black bear,

*Ursus americanus,* distinct from two other subspecies also occurring in the southeastern United

States, *Ursus americanus americanus* (American black bear) and *Ursus americanus floridanus*

(Florida black bear).

62.    FWS issued the final delisting rule on March 11, 2016, three years before the next

5-year review was due, based on a finding that the species had recovered.  81 Fed. Reg. 13124

(March 11, 2016).  This decision relied on claims that over 312 square miles of bear habitat had

been restored or permanently protected and that the recovery goal of two viable populations

connected by a secure corridor had purportedly been met.

63.    The delisting decision also removed from the List of Endangered and Threatened

Wildlife the other subspecies of the American black bear that had been listed within the

historical range of the Louisiana black bear due to similarity in appearance.

---

[5] Deborah Fuller, Louisiana black bear (*Ursus americanus luteolus*) 5-Year Review: summary
and evaluation, Louisiana Ecological Services Field Office, U.S. Fish and Wildlife Service,
Lafayette, Louisiana (2014).

64.     In the final delisting decision, FWS identifies four main areas of Louisiana that are inhabited by black bears: Tensas River Basin ("TRB"), Three Rivers Complex ("TRC"), Upper Atchafalaya River Basin ("UARB"), and Lower Atchafalaya River Basin ("LARB").

65.     Only the TRB and LARB contain populations (FWS uses the term "subpopulations") of the native subspecies (*luteolus*) that have been continually present in those areas.

66.     The UARB contains an introduced, non-native population descended from black bears of another subspecies (*Ursus americanus americanus*) brought to the UARB from Minnesota in the 1960s to support game hunting.

67.     The Minnesota bears were shipped into the UARB by the Louisiana Wild Life and Fisheries Commission.  Based on historical accounts and the genetics study by Laufenberg and Clark, there appears to have been no Louisiana black bear population in the UARB at the time of introduction.

68.     According to Laufenberg and Clark, the current genetic makeup of the UARB bears more closely resembles that of Minnesota *americanus*, not *luteolus*.

69.     The TRC population did not exist at the time of original listing, but was formed as a result of a multi-year (2001-2009) translocation project by FWS as part of its effort to implement its Recovery Plan.  The TRC is located between the TRB and the UARB.  According to the genetics study by Laufenberg and Clark, the TRC population is now composed largely of bears moved from the TRB and hybrids between TRB and UARB bears.

70.     At the time of delisting, FWS did not know how many bears were in the TRC population.

71.     The translocation project was intended to facilitate development of a connecting corridor between the TRB (occupied by the native *luteolus*) and the UARB (occupied by the introduced, non-native *americanus*).  It is now known, largely through the genetics study by Laufenberg and Clark, that there was previously no potential for natural dispersal of bears between the TRB and UARB.  In an effort to implement its Recovery Plan, FWS chose to bring about contact between the native TRB and alien UARB populations.  As further demonstrated by the Laufenberg and Clark study and other studies, such contact now has led to hybridization of the TRB and UARB bears and to a critical new threat to the natural genome of the native Louisiana black bear.  The delisting decision's finding of "recovery" of the subspecies relies heavily on its conclusion that the Recovery Plan criteria have been met.  However, reliance on flawed implementation of the Recovery Plan criteria in facilitating the connection and dispersal of bears between the native TRB and alien UARB, and subsequently finding recovery on fulfillment of the Recovery Plan, has threatened and continues to threaten the native Louisiana black bear.

72.     The Atchafalaya River Basin is an ecological wonder, the largest river swamp and largest contiguous bottomland hardwood forest in North America, and an irreplaceable natural resource for native and migratory wildlife and persons alike.  The Basin's 1.4 million acres of bottomland hardwoods, cypress swamps, and coastal marshlands are a fraction of its historical expanse.  Extensive harvests of the Basin's cypress and bottomland hardwood forests well into the 20th century, and the Army Corps of Engineers' ("Corps") construction of flood protection levees significantly reduced the Basin's forested wetlands.  Home to some of the most productive swamp wetlands in the world, a robust Cajun heritage, and the Louisiana black bear,

what remains of the Basin offers protective wetland habitat for wildlife, ecotourism, and commercial and recreational fishing and hunting.

73.     The entire Basin was part of the Louisiana black bear's historic range.  However, much like the Basin, the bear's habitat was greatly diminished and degraded by human interference.  Past and present development in the Basin has caused irreparable and expansive destruction and hydrologic alterations to the Basin's ecosystems, water quality, and wildlife habitat.  The remaining wetland forests provide important nutritional sources and habitat cover for the continued survival of the Louisiana black bear, which prefers to den in hollow old growth cypress trees along sloughs, lakes, and bayous in the Basin.  The delisting decision alleges that a sufficient quantity of habitat has long-term protection, and remnant wetland forests are provided adequate protection through applicable conservation regulations (*i.e*., the Clean Water Act of 1972 ("CWA")).  However, historical impairments continue to fester without reprieve and new development projects often exacerbate existing harms.  The long-term health and sustainability of these irreplaceable wetlands remain threatened despite the efforts of many, including plaintiff organizations, to protect and restore the Atchafalaya Basin.  The delisting of the Louisiana black bear, thus removing protections for its critical habitat, puts the remaining resources of the Basin and its inhabitants at further risk.

74.     While habitat loss from development has been relatively stabilized in certain areas since the Louisiana black bear was listed, habitat loss from climate change is increasing.  Specifically, habitat in the LARB is eroding into the Gulf.

75.     With regard to the LARB population, FWS acknowledged in the delisting decision that it is the population at greater risk of extinction due to future anticipated development and sea level rise.  At the time of delisting, the LARB population was experiencing

a high degree of mortality from vehicular collisions and nuisance-related removals.  The area it occupied had not increased since listing.  Development continues to impair habitat quality causing further fragmentation, including in breeding habitat for the LARB population, and in habitat directly north in the Atchafalaya Basin.

76.    The potential for interchange between the LARB and other populations of true luteolus is low – *i.e.*, it is isolated, restricted by traffic and development along Highway 90, and encroached by the rising seas at the coast.  Despite the delisting's numerous claims regarding the mobility and adaptability of the bear, the LARB population is not likely to expand based on interchange with other native groups.  The LARB population cannot expand beyond its present, occupied habitat in part because it lacks connecting corridors to facilitate mobility.

77.    FWS unreasonably relies on conflicting adaptability assumptions to conclude that the current and foreseeable threats to the LARB are not substantial.  Yet FWS does not know the probability of long-term persistence of the LARB population, and does not base its conclusions about the Louisiana black bear's viability on this population – *i.e.*, the potential for extinction for this population was found not to impact FWS's conclusion that the species had recovered.  The LARB is not considered a viable population upon which FWS based its recovery conclusion.

78.    Based on the means of values provided in the delisting rule and a post-delisting study in the TRC, the total number of free-living black bears within the original range of the subspecies *luteolus* is approximately 700, including the non-*luteolus* UARB population.  That figure includes about 296 in the TRB, 164 in the LARB, 69 in the UARB, 90 in Mississippi, and 73 in the TRC.  Based on minimal estimates, the number of true Louisiana black bears (i.e. not including the UARB) in the U.S. could be well under 500.  Prior to colonization, the overall

range of *luteolus* would have contained at least 80,000 bears; thus, current numbers are less than one percent of the historic figure.

79.     Based on data in the delisting rule, the current total breeding range of the Louisiana black bear (including the non-native UARB population) is 2,823 square miles (7,311 sq. km).  However, the original range of subspecies *luteolus* was at least 120,000 square miles (311,000 sq. km).  If the range of the alien UARB population (454 square miles or 1,176 sq. km) is excluded, the current overall range is just under two percent of the historic range.

80.     FWS took the arbitrary position in the delisting decision that comparisons between current and historic populations and range were not relevant to its determination that the Louisiana black bear had recovered.  FWS claimed that it was enough that the current population had claimed "long-term viability" without reference to loss of historic numbers and range.

81.     At the time of delisting, the most significant causes of death in Louisiana and Mississippi were poaching and road kills, *i.e.* human-caused mortality.  Roads fragment bear habitat and increase the chances of vehicle collisions, increase human contact, decrease habitat use and quality, and restrict bears' movement to other areas.

82.      Despite the primary causes of habitat loss and mortality being human caused, FWS claimed in the delisting decision that the subspecies as a whole, and specifically the TRB and UARB "subpopulations," are viable over the next 100 years.  In reaching this determination, FWS claimed that there is sufficient protected habitat to support breeding and movement of individuals between "subpopulations" so that the subspecies is not currently, and is not likely to again become, a threatened species.  However, bear habitat continues to be severely degraded, and development causing adverse modification in "protected" habitat continues to occur.

27

83.     One of the major points relied upon by FWS in its recovery finding and delisting the Louisiana black bear was the connection between populations in the TRB and the UARB via the TRC.  However, the connection is erroneously relied upon because in fact the UARB population does not consist of the subspecies *luteolus*.  The connection of the UARB population with Louisiana black bear populations should not be considered to constitute sufficient recovery, and in fact threatens the remaining Louisiana black bears with hybridization.

84.     Prior to the TRC translocations, and with full knowledge that the genetic status of the Louisiana black bear was under ongoing scrutiny and study, FWS failed to adequately assess the genetic status and historic origin of the UARB bears, and failed to adequately assess the effects that the TRC translocations and resulting connection between the UARB and TRB might have on the native TRB population.  Such failure is further demonstration that the delisting, which was done partly on the grounds that the TRC translocations had facilitated the connection, was not based on the best available science, and therefore not in accordance with the law.

85.     On November 2, 2017 the Plaintiffs filed a 60-day Notice of Intent to Sue pursuant to 16 U.S.C. § 1540(g).  On April 2, 2020 the Plaintiffs filed a second 60-day Notice of Intent to Sue.

86.     By letter dated December 12, 2017, FWS responded to the first Notice of Intent to Sue.  The FWS stated that it stood by its decision to delist the Louisiana black bear.

87.     On May 6, 2020 FWS responded to the second 60-day Notice of Intent to Sue, maintaining that its delisting decision was based on the best science available and that it had properly evaluated all relevant factors.

## CLAIMS FOR RELIEF

### I.  First Claim for Relief – Violations of ESA with Respect to the Delisting Factors

88.     Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

89.     If any one of the five listing/delisting factors contained in Section 4(a)(1) of the Act is present, the ESA requires the Louisiana black bear remain listed.

90.     FWS violated the ESA by delisting the Louisiana black bear despite the fact that the best scientific data available do not "indicate that the population is no longer threatened," 50 C.F.R. § 424.11(d)(2), and by drawing conclusions about the factors for delisting without using the best scientific data available and that are arbitrary and capricious, an abuse of discretion, and not in accordance with law.

### Factor I. The Present or Threatened Destruction, Modification, or Curtailment of its Habitat or Range

91.     The Louisiana black bear does not in fact have the habitat or range claimed by FWS to support delisting, because not all of the bears FWS considers to occupy Louisiana black bear habitat are in fact of the *luteolus* subspecies, the corridors claimed to be connecting different populations are inadequate to assure connectivity between true populations of *luteolus*, and substantial threats to bear habitat remain.  Therefore, the analysis of this factor was not based on the best available scientific data and this factor does not support delisting.

92.     Under the FWS Recovery Plan for the Louisiana black bear (which itself was flawed and greatly insufficient to assure anything approaching true recovery), there were three major goals: establishment of two viable populations of Louisiana black bears in the Tensas and Atchafalaya River Basins; establishment of a secure corridor between these populations; and

long-term protection of the corridors.  Supposedly, if these criteria were met, *luteolus* would have adequate habitat and range to ensure its long-term survival as a subspecies.

93.    FWS declared the criteria of the Recovery Plan had been met on the basis of the supposed viability of the TRB and UARB populations and the supposed establishment of a corridor between those two populations.  However, the UARB population does not consist of true Louisiana black bears, and connecting the TRB and the UARB has and will continue to result in further hybridization, rather than recovery.  FWS's attempts at connectivity through the TRC leaves the TRB population at great risk of hybridization and endangers the integrity of the native genome.

94.    Prior to establishment of the TRC population, FWS failed to adequately assess the genetic status and historic origin of the UARB bears, and failed to adequately assess the effects that the TRC translocations might have on the natural genome of the native TRB population.  The FWS misrepresented or ignored available genetic data in the course of making its decision to establish the TRC population, and to use it to supposedly meet the Recovery Plan criteria.

95.    In order to actually meet its Recovery Plan criteria, FWS would have to demonstrate viability, not of the UARB population, which does not consist of *luteolus*, but of the LARB and TRB populations, and would have to demonstrate secure connectivity between the TRB and the LARB.  However, FWS does not claim to have demonstrated the viability of the LARB population, nor its connectivity to the TRB population.  Thus, there are not in fact two populations of Louisiana black bears that are securely connected, and the Recovery Plan criteria for habitat and range are not met.

96.    The delisting rule's conclusion that the destruction of Louisiana black bear habitat or range does not and will not constitute a substantial threat to the bear in the foreseeable future

is both factually and legally flawed. FWS erroneously concludes that the Corps' acquisition of fee-title and easements on private land in the Atchafalaya Basin, habitat protected on Federal and State lands, mitigation banks, the conversion of cypress swamps to higher elevation forests, reduced projections of urban expansion and development, and long-term protections over private lands through existing regulatory mechanisms has sufficiently mitigated the threat of habitat loss.

97.    The original listing decision considered the lack of protected habitat in the Atchafalaya River Basin to be a significant contribution to the overall threat of habitat loss. The delisting decision boasts significant habitat gains, yet inappropriately relies on unsupported assumptions regarding development and habitat trends in the Atchafalaya Basin. The projected hydrologic alterations in the Basin that the FWS relies on to project increased habitat for the bear would actually severely debilitate the functionality of the Basin Floodway, and would result in significant adverse modifications to the quantity and quality of the Basin's wildlife habitat. These alterations would also undermine the jurisdictional applicability of conservation regulations (*i.e.*, the Clean Water Act) the Service relies on to allege adequate existing protections for black bear habitat. Additionally, as development continues on "protected" lands in Louisiana black bear range, habitat quality will continue to degrade.

98.    The destruction of forested wetlands and wildlife habitat in the Atchafalaya Basin and coastal Louisiana not only represents past, present, and foreseeable future threats to Louisiana black bear habitat under present regulatory mechanisms, but also threatens to reduce its range. Present and projected threats to the Lower Atchafalaya River Basin population of the Louisiana black bear, its habitat, and the adjoining habitat north through the Atchafalaya River Basin present significant obstacles to bear recovery that the delisting decision inappropriately

and cursorily dismisses.  The delisting decision fails to meaningfully consider remaining threats to the bear's range in the LARB and supporting habitat in the Basin.

### Factor 4. The Inadequacy of Existing Regulatory Mechanisms

99.     The delisting's conclusion that existing regulatory mechanisms are adequate to address the threats to the Louisiana black bear posed by the other listing factors is not based on the best scientific and commercial data available and is arbitrary and capricious.

100.     The premise of a delisting is that regulatory mechanisms outside of the ESA will be sufficient to protect the species.  This is not the case here, because even with ESA protections, the species has not yet achieved recovery, and it certainly cannot be expected to do so without ESA protection.

101.     Regulatory mechanisms in this context means currently existing, enforceable measures, and does not include voluntary, unenforceable measures or monitoring.

102.     In fact, there are continuing threats to the bear that will no longer be addressed with delisting.  For example, human caused mortality (hunting, vehicular mortality), hybridization, urban expansion and development (such as the proposed upgrade of U.S. Highway 90), and loss of habitat from climate change will all increase with both a delisting and the passage of time.  There are no regulatory mechanisms in place to alleviate these threats.

103.     The delisting decision does not adequately address the critical status of the LARB population.  The probability of its long-term persistence is unknown, its distribution has not improved since the listing in 1992, and only 5.8% of its breeding habitat is protected.  It is foreseeably threatened by human development and sea level rise.  FWS did not address regulatory mechanisms that would eliminate or control these threats.

104.    Specifically, without ESA protection, continued human-caused impacts, including hybridization and lack of protected habitat will continue to threaten the existence of the Louisiana black bear.

105.    When FWS delisted the Louisiana black bear, the Agency also removed the critical habitat designation protecting 1,868 square miles of the bear's range.  That designation had been made only six years before the proposal to delist.  It delineated an area in which actions authorized, funded, or carried out by the federal government were subject to scrutiny, pursuant to Section 7 of the ESA, to insure they would not adversely affect the bear or its habitat.  Not having such scrutiny obviously was one of the factors threatening the bear, because it was considered legally necessary to designate the critical habitat area where such scrutiny would apply.  Now, all actions that previously would have been subject to federal scrutiny under the ESA may proceed unchecked.

106.    Without procedural and substantive ESA protections for designated critical habitat, areas essential to the conservation of the Louisiana black bear are significantly more vulnerable to adverse modification and degradation.

107.    The delisting's assessment of the adequacy of regulatory mechanisms is incomplete and factually flawed.  While relying on the Clean Water Act as an existing regulatory mechanism that will purportedly protect the bear and its habitat post-delisting, the decision fatally fails to account for the de facto failures in Clean Water Act implementation and enforcement, including with regard to compensatory mitigation, in the New Orleans Corps District.

108.    The FWS's failure to consider on-the-ground application (or lack thereof) of the Clean Water Act mechanisms, development on property purportedly protected under easements,

and timber clear cutting in Wildlife Management Areas, and the consequent impacts on wildlife habitat, is arbitrary and capricious, and in violation of the ESA and APA.

109.    The delisting rule also fails to identify regulatory mechanisms in place that will address the unprecedented destruction of existing hydrology and wildlife habitat as a result of climate change and the direct and cumulative effects therefrom, including rising seas, land subsidence, increased severe weather, and predicted hydrologic alterations in the Atchafalaya Basin.

110.    Without the protections stemming from the listing and critical habitat designation, human development will continue to encroach upon the bear's natural habitat, there will be less control of illegal killing, climate change will threaten the LARB population, and the ominous hybridization process will continue to spread unchecked.  Slight recoveries in population will not be able to reverse the trend toward extinction that existed before the listing of the Louisiana black bear.

### Factor 5. Other Natural or Manmade Factors Affecting its Continued Existence

111.    FWS also failed to account for the potential for human-induced risk of hybridization between the Louisiana black bear (subspecies *luteolus*) and other subspecies of the American black bear.  Consideration of this factor must include a prediction of future negative effects of anticipated conditions or human actions.  FWS made no such predictions.

112.    As illustrated in the Laufenberg and Clark study, which FWS states was the factor that initiated work on the delisting decision, there used to be distinct populations in the TRB, UARB, and LARB.  The TRB and LARB populations each contained genetically distinctive groups of Louisiana black bears; however, the bears in the UARB are genetic descendants of *Ursus americanus americanus* from Minnesota.  These groups remained

34

geographically separated until, as part of the FWS recovery efforts, bears from the TRB were brought to the TRC, which is significantly closer geographically to the UARB. FWS did this for the specific purpose of encouraging interbreeding between the TRC bears and UARB bears in order to increase population size and to hopefully connect the TRB, TRC, and UARB populations.

113.    However, this actually threatens the Louisiana black bear more than it helps it because the non-native bears in the UARB will dilute the native genome of the Louisiana black bear (*luteolus*).

114.    Such FWS-facilitated hybridization is ignored by the final rule because FWS assumes that the UARB bears are Louisiana black bears, regardless of the genetic analysis results and historical evidence to the contrary. Genetic analysis by Laufenberg and Clark shows that interbreeding of the TRB and UARB populations is already proceeding by way of the TRC.

115.    The final delisting rule claims that Louisiana black bears may have been hybridized at the time of listing and that this was not a significant cause for concern. However, this assertion runs counter to the Agency's own analysis, primarily through Laufenberg and Clark's study, which shows that the threat of hybridization for the Louisiana black bear is directly caused by the introduction of *americanus,* and that there was no significant interbreeding between the various Louisiana populations prior to translocations to the TRC.

116.    FWS contradictorily claims on the one hand that potential hybridization is not a cause for concern because there was already hybridization at the time of listing, and on the other hand that the Louisiana black bear was listed because it is a distinct subspecies of black bears and its unique genetics should be preserved.

117.    The Louisiana black bear was delisted on the basis of recovery – *i.e.* that the particular subspecies had recovered, not on the basis of extinction, *i.e.* that the species no longer existed due to hybridization.  Nor was it delisted based on a purported error in the data supporting the original listing, such that there never was a distinct subspecies of Louisiana black bears, and thus there is not a need to protect it.  Therefore, in order to delist the bear, FWS must demonstrate that the *luteolus* subspecies has recovered and is no longer in danger of extinction, whether from hybridization or other factors.

118.    FWS also did not adequately take into consideration current and future habitat loss due to climate change.  The delisting erroneously concludes that due to its "adaptability, mobility, and demonstrated resiliency … we conclude that the effects of climate change are not a threat to the Louisiana black bear now or within the foreseeable future."

119.    As evidence for the bear's adaptability, FWS tells of the 2011 Morganza floodway operation, where 60% of the UARB breeding habitat was covered in floodwaters.  FWS claims that approximately 90% of the bears relocated to the 40% of the habitat that was not flooded, while the remainder fled.  Ultimately, "most" of the bears returned.  However, other scientific studies, including Laufenberg and Clark, have found that repeated flooding of the Morganza Spillway could negatively affect the bears.  Their study also states that flooded wetlands are not used by bears.

120.    Given that climate change is rapidly changing the landscape, particularly in low-lying areas like Louisiana, FWS must take into account the impacts of climate change on the continued existence of the Louisiana black bear.

121.    FWS must also take into account its failure to assure connectivity of the LARB population with any other *luteolus* population.  Not only does this population remain vulnerable

to climate change, human-caused mortality, and limited fragmented habitat, but the Service failed to assure access to, establish, and protect movement corridors between this isolated population and another population of *luteolus*.

122.    FWS has violated the ESA and the APA by drawing conclusions about the factors for delisting without using the best available science, and that are arbitrary and capricious, an abuse of discretion, and not in accordance with law.  The challenged decision should therefore be set aside pursuant to the ESA and APA. 16 U.S.C. § 1533; 5 U.S.C. § 706(2).

## II.  Second Claim for Relief – Failure to Substantiate that the Louisiana Black Bear is Recovered Violates the ESA

123.    Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

124.    Because the delisting here had recovery as its basis, in addition to considering the five delisting factors, FWS must "substantiate" that the species has recovered, and may delist only if the "best scientific and commercial data available indicate that it is no longer endangered or threatened."  50 C.F.R. 424.11(d)(2).  Thus, FWS must look at factors like population size and population trends, and the stability of habitat quality and quantity.

125.    The FWS delisting did not rely on the best available scientific data, which in fact indicates that population and habitat size and trends do not indicate recovery or that the species is no longer threatened or endangered.

126.    The delisting rule relies on an invalid policy to unreasonably conclude that the Lower Atchafalaya River Basin subpopulation of Louisiana black bears is not a significant population warranting further review under the "significant portion of its range" analysis.  The LARB was one of the original breeding populations existing at the time of the bear's listing. FWS bears the burden to prove recovery for the entire subspecies, including the LARB

population.  However, not only did FWS fail to assess the long-term persistence of the LARB, but it relies on unsubstantiated speculation and conjecture to conclude that the LARB is no longer threatened.

**A.**  **FWS Failed to Consider the Low Population Numbers of the Louisiana Black Bear, and Overestimated Population Size**

127.    The population growth of the Louisiana black bear does not represent recovery, and the delisting of the bear fails to consider the critical status of the LARB population.

128.    Based on the data in the delisting rule itself, the greatest annual growth rate of the three Louisiana black bear populations in the 20 years after listing was about nine percent, far below potential for protected bear populations.  For example, in Maryland numbers grew from about 12 bears in the 1950s to over 1,000 today, albeit partly through influx from neighboring states.  An isolated group of 18 bears introduced along the Kentucky-Tennessee border in 1998 increased to 228 in just 14 years, an annual growth rate of 18.3 percent.

129.    The mean total estimated population level for the Louisiana black bear was around 700 individuals (including the non-*luteolus* UARB population) in an area of 2,823 square miles at the time the final delisting rule was promulgated.  The minimum number could be barely 500.  The resulting density is well below that of many other comparable black bear populations in parts of such states as Arkansas, California, Maine, North Carolina, Tennessee, and Virginia.

130.    The population size of Louisiana black bears was overestimated by inclusion of the non-*luteolus* UARB population, and by relying on the interchange between the TRB and UARB populations by way of the TRC as evidence of the security of those populations. Therefore, the population size, the interconnection between populations, and indeed the number of populations of Louisiana black bears was overestimated to support the claim that recovery has been achieved.

38

131.    FWS considered the Louisiana black bear recovered despite essentially writing off the LARB population, the second largest existing population of Louisiana black bears, whose long-term viability it could not predict, and which is subject to threats from climate change, development causing habitat degradation and fragmentation, and human-caused mortality.

132.    FWS's claim of recovery rests solely upon the TRB population, the UARB population (which is non-*luteolus*), and the TRC population, the numbers of which it could not even estimate at the time of delisting.  Only the TRB and UARB populations are claimed to be "viable," and one of those is not even *luteolus*.  This leaves one "viable" population that is not connected with any other *luteolus* population.

133.    Even assuming FWS's mean population figures are correct, recovery is claimed despite the fact that the subspecies has reached less than one percent of its original numbers (700 compared with at least 80,000).

134.    FWS asserted that the current population was sufficient to meet the goals of the Recovery Plan.

135.    However, apart from the fact that the Recovery Plan incorrectly relied on a non-*luteolus* population, as acknowledged in the delisting rule, "recovery plans are not regulatory documents."  Thus, even assuming the goal of the Recovery Plan (interconnection of two "viable" *luteolus* populations) had been met, that would not mean the species was actually recovered in accordance with the meaning of that term in the ESA.

136.    For the delisting rule to claim that an entire subspecies has recovered, when it has reached less than one percent of its original numbers, and to argue that historical population status is irrelevant to recovery, is without scientific basis and is arbitrary and capricious.

## B. **Recovery is Improperly Claimed without Regard to Historic Range**

137.    In considering whether a species is recovered, FWS must consider whether the loss of its historical range undermines the viability of the species as it exists today.  FWS's delisting decision fails to conduct this essential review.

138.    The Louisiana black bear currently occupies only approximately two percent of its historic range (2,823 square miles versus 120,000 square miles).

139.    Instead of considering the loss of historic range in determining whether the species is viable today, in the delisting decision FWS only considered this topic in the context of the review of the "status of the species" throughout "all or a significant portion of its range." 16 U.S.C. § 1533(c)(2).  FWS makes no comparison of current versus historic range or examines how the loss of historic range is impacting the species today.

140.     The analysis of threats to areas of the existing range does not obviate the necessity of an analysis of how the dramatic reduction in historic range still impacts the status of the species.

141.    The Louisiana black bear originally was listed at least in part because of severe "curtailment of its habitat or range."  FWS stated that the "bear meets the criteria for protection under the Act on the basis of past habitat loss alone."  FWS has not shown that this is no longer the case.

142.    At least parts of the 98 percent of the historic range that is still not occupied (including the vast Texas portion) would need to be considered in a delisting decision that relies on the best available science and considers the appropriate relevant factors.  That has not been done here.

C.    **FWS's Conclusion that the Louisiana Black Bear is Not Threatened in a "Significant Portion of its Range" is Arbitrary, Capricious, and Not in Accordance with Law**

143.    FWS claims in the delisting rule that the consideration of whether the Louisiana black bear is still threatened in "a significant portion of its range" only requires that it look at whether the Louisiana black bears in any significant portion of the *now-existing* range are threatened more than in other areas and still need protection.  If so, FWS admits, it would necessitate retaining threatened status for the entire subspecies.  FWS claims that there are not such significant portions of the range where the Louisiana black bear is still threatened, and thus the entire subspecies can be delisted.

144.    While FWS admitted that the LARB population faces greater threats than bears in the rest of the current range, and that it could not predict its long-term viability, FWS nevertheless concludes that the LARB population is neither threatened nor "significant."

145.    FWS has no data supporting a conclusion that the LARB population is viable, and has improperly discounted the ongoing threats to the LARB population.

146.    The final delisting rule bases its conclusion that the LARB is not threatened, despite recognizing its myriad threats and failure to assess its long-term viability, on the unsubstantiated presumption that the stability or increasing size of the population during listing will continue without ESA protections.

147.    The conclusion that the LARB population is not threatened is not supported by the best available science or the evidence relied on by FWS.

148.    Moreover, FWS's conclusion that the portion of the range occupied by the LARB is not "significant" is also not supported by the law or the evidence.

149.    The delisting rule indicates that the final decision to delist was made in accordance with an FWS "Final Policy on Interpretation of the Phrase 'Significant Portion of its Range' in the Endangered Species Act" (the "SPR Policy").

150.    The SPR Policy provides that "a portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." 79 Fed. Reg. 37,578, 37,579 (July 1, 2014). In other words, a portion is "significant" under the SPR Policy if the removal of that portion would result in the remainder of the species becoming endangered or threatened.

151.    The SPR Policy's definition of "significant portion" has since been vacated nationwide.[6] It is both facially invalid and invalid as applied to the final delisting rule's SPR analysis for the Louisiana black bear.

152.    Even assuming the SPR Policy were valid, the conclusion in the final rule that the LARB population does not occupy a "significant" portion of the Louisiana black bear's range is also arbitrary and not supported by the best available science, because it rests on the conclusion that because the TRB and UARB populations are "viable," even the loss of the entire LARB population would not render the entire species threatened. Yet, the UARB population is not *luteolus* and so cannot be relied on for this conclusion.

---

[6] *See Desert Survivors v. U.S. Dep't of Interior,* 321 F. Supp. 3d 1011 (N.D. Cal. 2018) (finding the SPR Policy's definition of "significant portion" to be inconsistent with the ESA); *Desert Survivors*, 336 F. Supp. 3d 1131 (subsequent order vacating the Policy's definition of "significant portion" nationwide). *See also Ctr. for Biological Diversity,* 248 F. Supp. 3d at 958 (holding that "[t]he SPR interpretation set forth in the Final SPR Policy impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA" such that the policy is "not a permissible administrative construction of the ESA's SPR language.").

153.    Under the current SPR Policy, the LARB would be an SPR because the hypothetical loss of the LARB population would cause the Louisiana black bear to become endangered or likely to become so in the foreseeable future with solely one "viable" true *luteolus* population remaining in the TRB.

**III. Third Claim for Relief – the Delisting Decision is Arbitrary and Capricious, An Abuse of Discretion, and Not in Accordance with Law**

154.    Plaintiffs hereby re-allege and incorporate all previous paragraphs of this complaint.

155.    The final delisting rule suffers from irreconcilable inconsistencies in its recovery finding.

156.    The question of whether *luteolus* is a valid subspecies was mentioned in the proposed delisting rule, but was not presented as a reason for delisting.  The delisting proposal was based only on "recovery."  Yet, the final delisting rule, twice suggests taxonomy as a factor being considered in the delisting.  Specifically, research work is introduced and used to provide purported evidence that *luteolus* may have disappeared through hybridization and/or that it may never have been valid.  The justification that *luteolus* is not a valid subspecies is more akin to claiming error in the original listing or extinction than it is to the stated basis for the delisting, which is recovery.  Yet, the final rule does not claim error or extinction as a basis for delisting, but only recovery.

157.    The delisting rule uses these and other statements regarding hybridization to discount comments on the proposal that raised concerns about hybridization as an ongoing threat to the subspecies.  The delisting rule appears to take the contradictory position that hybridization already has occurred but that it is not a threat.  FWS statements on hybridization are inconsistent

with FWS conclusions in both the listing and delisting decisions that *luteolus* is a valid subspecies and the conclusion in the delisting decision that the subspecies has recovered.

158.    For decades plaintiffs have worked diligently to advocate for the protection and restoration of the Louisiana black bear and its habitat.  FWS's management of the Louisiana black bear while listed has not only failed to achieve recovery, but has actually developed new, additional threats to this unique subspecies of black bear.  The premature and unsupported delisting of the Louisiana black bear betrays not only plaintiffs' decades-long efforts to push FWS to fulfill its duty to protect the Louisiana black bear, but also the very purpose of the ESA to conserve endangered or threatened species.  FWS's 2016 delisting of the Louisiana black bear and removal of its critical habitat designation on the basis of "recovery" of the subspecies is illusory, unsupported by the best available science, arbitrary and capricious, and abuse of discretion, and not in accordance with law.

## RELIEF REQUESTED

THEREFORE, plaintiffs request that this Court:

1.    Declare that defendants violated the ESA and implementing regulations, and the APA, by delisting the Louisiana black bear and removing its critical habitat designation;

2.    Vacate and set aside the defendants' March 2016 delisting decision;

3.    Remand to the defendants to: (a) relist the Louisiana black bear; (b) reassess the scientific studies pertaining to the Louisiana black bear; (c) reassess the Recovery Plan for the Louisiana black bear, updating and revising as necessary; and (d) re-designate critical habitat for the Louisiana black bear.

3.    Award plaintiffs their costs, expenses, and attorneys' fees pursuant to the citizen

suit provision of the ESA, 16 U.S.C. § 1540(g)(4) or under the Equal Access to Justice Act, 28

U.S.C. §2412(d); and

4.    Grant plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this 30th day of September, 2020.

s/ Misha L. Mitchell
Misha L. Mitchell
La. Bar. No. 37506
Attorney-at-Law
411 Walnut Street #15255
Green Cove Springs, FL 32043
Phone: (225) 692-1133
Fax: (225) 692-4114
Email: basinkeeperlegal@gmail.com
*Attorney for Plaintiffs*

Of Counsel:

Paula Dinerstein
D.C. Bar No. 333971
Peter Jenkins
D.C. Bar. No. 477229
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring MD  20910
Phone: 202-265-7337
Email: pdinerstein@peer.org
pjenkin@peer.org

*Application for Pro Hac Vice forthcoming*