## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ATCHAFALAYA BASINKEEPER,**             CIVIL ACTION
**ET AL.**

**VERSUS**

**DAVID BERNHARDT, ET AL.**        NO. 20-00651-BAJ-EWD

### RULING AND ORDER

In 1992, the U.S. Fish and Wildlife Service (the Service) listed the Louisiana Black Bear as a threatened species under the Endangered Species Act (ESA). In 2016, the Service delisted the bear after determining that its population had recovered and was no longer threatened. Plaintiffs, a collection of non-profit organizations and individuals who assert an interest in the Louisiana Black Bear and its habitat, dispute the Service's determination and challenge the delisting decision. Now before the Court are Plaintiffs' **Motion For Summary Judgment (Doc. 51)**, the Federal Government Defendants' **Cross Motion For Summary Judgment (Doc. 58)**, Intervenor-Defendant State of Louisiana's **Motion For Summary Judgment (Doc. 64)**, and Intervenor-Defendant Safari Club International's **Cross Motion For Summary Judgment (Doc. 65)**. For the reasons that follow, Plaintiffs' Motion will be denied. Judgment will be entered in favor of Defendants.

## I.  BACKGROUND

### A. The Louisiana Black Bear

The Louisiana Black Bear (*Ursus americanus luteolus*) is one of 16 subspecies

of the American Black Bear (*Ursus americanus*) and one of three black bear subspecies found in the southeastern United States. REMOVAL OF THE LOUISIANA BLACK BEAR FROM THE FEDERAL LIST OF ENDANGERED AND THREATENED WILDLIFE, 81 Fed. Reg. 13,124, 13,124 (Mar. 11, 2016). *Luteolus* is a large mammal with long, coarse black hair and a short, hairy tail. *Id* at 13,125. It is not readily visually distinguishable from other black bear subspecies. *Id. Luteolus*, like other black bears, can thrive in a wide variety of habitats, and is found in southeastern United States floodplain forests as well as marsh, upland forested areas, forested areas along bayous, brackish and freshwater marsh, salt domes, and agricultural fields. *Id.* at 13,126. *Luteolus* is typically omnivorous and will eat almost anything available, ranging from vegetation, fruits, and grains to beetles and grubs. *Id.* Historically, *luteolus* lived throughout Louisiana, eastern Texas, and Mississippi. *Id.* at 13,126–27.

Beginning in the 1700s and early 1800s, hunting and large-scale destruction of forests severely diminished *luteolus* numbers and range such that, by the 1950s, only 80 to 120 bears were estimated to remain in Louisiana. *Id.* In response to low black bear numbers, the State of Louisiana carried out a bear reintroduction program in the 1960s, during which 161 non-native *U. americanus* bears were brought from Minnesota. 57 Fed. Reg. 588, 591–2 (Jan. 7, 1992) (*hereinafter*, Listing Rule). Thirty-one of these Minnesota bears were released in the Tensas River Basin (TRB) and 130 into the Upper Atchafalaya River Basin (UARB). Jared S. Laufenberg & Joseph D. Clark, *Population Viability & Connectivity of the Louisiana Black Bear (Ursus*

2

*americanus luteolus*), 3 (2014).

By the early 1990s, clearing of land for agricultural purposes had reduced *luteolus*' original range by more than 80 percent. Listing Rule at 591–592. Fragmentation of the bear's remaining habitat led to isolation of already small subpopulations of *luteolus*, "subjecting them to threats from such factors as [random population fluctuations] and inbreeding." *Id*. At the time of listing, known breeding subpopulations, believed to be isolated from each other, existed in three parts of Louisiana—the TRB, the Lower Atchafalaya River Basin (LARB), and the UARB. *Id*.

### B. The 1992 Listing of *Luteolus* Under the Endangered Species Act

Under the ESA, the Service, by delegation of authority from the Secretary of the Interior, is charged with conserving endangered and threatened species. 16 U.S.C. § 1531(b). One customary way the Service fulfills its duties is by adding or removing species from the Federal Lists of Endangered and Threatened Wildlife and Plants. *See* 16 U.S.C. § 1533. A species is an "endangered species" for purposes of the ESA if it is in danger of extinction throughout all or a significant portion of its range, and is a "threatened species" if it is likely to become endangered within the foreseeable future throughout all or a significant portion of its range. 16 U.S.C. § 1532(6).

On January 7, 1992, the Service issued a final rule listing *luteolus* as threatened within its historical range. Listing Rule at 592. In justifying its decision, the Service identified several threats to *luteolus*: (1) past habitat loss due to conversion of forest land to agriculture; (2) possible future habitat losses on privately owned land; and (3) the inadequacy of existing regulatory mechanisms to protect the

3

bear. *Id.* at 590–591. The Service also pointed to illegal killings of bears as a potential threat. *Id.* at 591.

When it came to crossbreeding between the native *luteolus* and imported Minnesota bears, however, the Service declined to identify this possible hybridization as a threat to the Louisiana bear. *Id.* at 592. Due to insufficient genetic data at the time, "hybridization as a threat [had] neither been discounted nor proved and remain[ed] unsettled." *Id.* The Service noted that black bears are inherently mobile animals and the areas where bears were found in Louisiana had, until only very recently (i.e., when widespread habitat destruction began in the 20th century), been part of a continuous habitat range for black bears throughout the southeast United States. *Id.* For this reason, the Service concluded that "[e]xpecting to preserve [*luteolus*], as is, presupposes a static condition which does not exist." *Id.* In other words, the extant populations of *luteolus* were likely the product of hybridization with other populations of black bears, had only recently become isolated by habitat loss, and was therefore not threatened by additional hybridization with another subspecies. *Id.* Indeed, due to similarity of appearance between *luteolus* and *U. americanus* (the bears from Minnesota), the latter species was classified as threatened in Louisiana as well—in other words, all black bears in Louisiana were protected in 1992. *Id.*

### C. The Recovery Plan

Following the 1992 listing of *luteolus* and as required by statute, the Service developed and approved a recovery plan for the species. *See* 81 Fed. Reg. at 13,135–38. The recovery objective was "delisting," and the plan gave three criteria for

achieving this: (1) the existence of "[a]t least two viable subpopulations, one each in the Tensas and Atchafalaya River Basins"; (2) the "[e]stablishment of immigration and emigration corridors between the two subpopulations"; and (3) "[l]ong-term protection of the habitat and interconnecting corridors that support each of the two viable subpopulations." *Id.* The service defined a minimum viable subpopulation as one that has a 95% or better chance of survival over 100 years. *Id.* at 13,145. Long-term protection was defined as having enough voluntary conservation agreements with private landowners and public land managers in *luteolus* habitat that habitat degradation was unlikely to occur, also over 100 years. *Id.* In 2009, the Service published a final rule designating approximately 1,195,800 acres as "critical habitat" for *luteolus* under the ESA. *See* Designation of Critical Habitat for the Louisiana Black Bear, 74 Fed. Reg. 10,350 (Mar. 10, 2009).

### D. Five-Year Review

In 2007, the Service began a five-year status review of *luteolus*, *see* 72 Fed. Reg. 42,425 (Aug. 2, 2007), which was published in early 2014. U.S. FISH AND WILDLIFE SERVICE, LOUISIANA BLACK BEAR 5-YEAR REVIEW: SUMMARY AND EVALUATION (Feb. 18, 2014), https://ecos.fws.gov/docs/five_year_review/doc4348.pdf. The review found that between 76% and 100% of the Recovery Plan's objectives had been achieved and that the bear's status was "improving," as demonstrated by growing population numbers in the TRB, UARB, and LARB. *Id.* at 2. The review also found that *luteolus* habitat had increased, with more than 250,000 new acres of conservation land since the bear's listing in 1992, with much of the new acreage "targeted to support existing breeding populations and/or to create movement

corridors between those populations." *Id.* at 3. Because ongoing population viability studies had not yet been completed, however, the Service was unable then, in 2014, to conclude that the three recovery criteria had been met. *Id.*

### E. The 2016 Delisting

This soon changed. On May 21, 2015, the Service issued a Proposed Rule to remove *luteolus* from the list of endangered species and a Draft Post-Delisting Monitoring Plan. *See* 81 Fed. Reg. at 13,125. After considering public comments, the Service published a final rule delisting *luteolus* on March 11, 2016. *See id.* at 13,124. According to the Service, all substantial threats to *luteolus* had been eliminated or reduced, adequate regulatory mechanisms existed, and the subspecies was viable for the next 100 years. *Id.* The areas supporting *luteolus* "black bear breeding subpopulations [had] increased over 430 percent . . . [and] approximately 148,400 [acres] . . . of private lands [had] been restored and permanently protected . . . since [*luteolus*] was listed. *Id.* at 13,127. The breeding subpopulations that existed at the time of listing—TRB, UARB, and LARB—were "stable or increasing" in size. *Id.* at 13,124. Studies estimated that there were now around 294 bears in the TRB, up from an estimated 40 to 50 at the time of listing, *id.* at 13,128; between 50 and 88 bears in the UARB, up from and estimated 30 or 50 at the time of listing, *id.* at 13,129; and between 136 and 194 bears in the LARB, up from possibly only 30 at the time of listing, *id.* at 13,130.

### i. Recovery criteria met

In its Final Rule, the Service discussed why it believed each of the three recovery criteria for *luteolus*, as set forth in the 1995 Recovery Plan, had been met.

6

First, two viable subpopulations existed in the Tensas and Atchafalaya River Basins, namely the TRB and UARB subpopulations. *Id.* at 13,135. The viability of these subpopulations was confirmed by a study that estimated that the probability of persistence over 100 years was over 95% for the TRB subpopulation and over 95% for the UARB subpopulation "except under the two most conservative sets of assumptions." *Id.* The study found that the long-term viability of bears in the UARB and TRB was further aided by the existence of a new breeding subpopulation, located between the UARB and TRB in an area called the Three Rivers Complex (TRC). *Id.* The Service introduced bears, primarily from the TRB, to the TRC between 2001 and 2009 "in order to facilitate movement of individuals between the UARB and TRB subpopulations." *Id.* at 13,135–36. The Service noted that "[r]ecent documentation of bear movement between the TRC and UARB and between the UARB and TRB via the TRC subpopulation demonstrate[d] the success" of the reintroduction effort. *Id.* at 13,135. The probability of long-term persistence for the LARB subpopulation, however, was "unknown." *Id.* at 13,133. Nevertheless, the documented health of the UARB and TRB bears satisfied the first recovery criterion.

Second, immigration and emigration corridors had been established between the UARB and TRB subpopulations. To justify its conclusion regarding this recovery criterion, the Service explained that research since the time of listing had clarified its understanding of what a corridor meant for a black bear. *Id.* at 13,136. The research suggested "that the presence of multiple satellite populations of breeding bears . . . may be more effective in establishing and/or maintaining connectivity

between the larger subpopulations than the presence of contiguous forested linkages." *Id.* This new understanding of habitat corridors drove the Service to create a satellite population of bears in the TRC that could connect the TRB and UARB bears. *Id.* By the time of delisting, there was "clearly documented evidence of interchange between the TRB and UARB subpopulations by way of the TRC." *Id.* In other words, a corridor had been established between two subpopulations of bears, and therefore the second recovery criterion was met. *Id.* at 13,137.

Third and finally, the Service explained that between 450,000 and 550,000 acres of *luteolus* habitat had been restored since 1992; 148,000 acres of private land had been permanently protected; and around 480,000 acres of public lands were being maintained and managed to benefit bears. *Id.* Because of these extensive habitat gains, the Service concluded that the third recovery criterion was met.

### ii. ESA threat factors

Next, the Service analyzed the status of *luteolus* under the ESA factors for identifying threats to a species. Under Factor A—the present or threatened destruction, modification, or curtailment of habitat or range—the Service found that much of *luteolus*' current available habitat was protected and continued to increase in size. *Id.* at 13,159. Habitat suitable for bears to breed had grown by a factor of five since the time of listing and was estimated to include more than 1,800,000 acres. *Id.* at 13,154. Moreover, around 460,000 acres of available habitat was held in Federal or State ownership, permanently protecting the land. *Id.* at 13,159. For these reasons, the Service found that destruction of habitat, the primary reason for listing *luteolus* in the first place, was no longer a threat to the long-term survival of the bear. *Id.*

8

Under Factor B—overutilization for commercial, recreational, scientific, or educational purposes—the Service noted that recreational hunting was not a threat to the survival of the bear because no hunting had been allowed since 1984. *Id.* Although the "potential for a regulated restricted harvest of the Louisiana black bear population exist[ed]," the Louisiana Department of Wildlife and Fisheries (LDWF) "would not consider a harvest if existing data and simulated population dynamics models indicate a restricted hunt could potentially compromise Louisiana black bear sustainability." *Id.* at 13,160.

For Factor C—disease or predation—the Service found, as it had at the time of listing in 1992, that "no evidence or data indicat[e] that disease or predation present a threat to the Louisiana black bear population." *Id.*

For Factor D—the adequacy of existing regulatory mechanisms—the Service discussed state and federal protections that would remain in place after delisting, including numerous federal laws, state counterparts to ESA protections, and state management plans for *luteolus*. *Id.* at 13,135, 13,138, 13,160–61. The Service further noted that trends in forested *luteolus* habitat since its listing indicate that regulations aside from ESA "have provided adequate long-term protection of Louisiana black bear habitat." *Id.* at 13,164. Following a lengthy analysis, the Service found that the existing regulatory mechanisms were adequate. *Id.*

Finally, for Factor E—other natural or manmade factors affecting the bear's continued existence—the Service returned to the discussion of hybridization. It first noted that evidence it relied on at the time of listing the *luteolus* suggested that "a

9

pure strain of [*luteolus*] subspecies no longer existed" because of habitat continuum between the TRB bears and the Minnesota bears in the UARB, bear releases in Arkansas resulting in dispersal into Louisiana, and the documented long-distance natural movements of bears. *Id.* at 13,165. The Service then concluded that based on "historical descriptions" of where the Minnesota bears were released in the UARB, "it is very likely there was no known breeding population in that area at the time," although it could not rule out the "presence of males in or traveling through that area." *Id.* The Service acknowledged that this information weighed in favor of a conclusion that the UARB bears were descended at least in part from the Minnesota bears. *Id.*

A genetic analysis of Louisiana bears performed in a 2014 study showed that the situation was more complicated. *See* Laufenberg & Clark, *supra*. That study, which the Service heavily relied on, "found varying levels of genetic structure among pairs of subpopulations and identified five genetically distinct groups." 81 Fed. Reg. at 13,165. The study "concluded that differentiation between the Louisiana black bear subpopulations within [Mississippi and Louisiana] can be explained as the result of restricted gene flow, accelerated genetic drift, and differing levels of genetic introgression as a result of the Minnesota [bear] introductions." *Id.* Crucially, the study also found that the genetic similarities and differences between *luteolus*, black bears in Arkansas, and black bears from Minnesota were too insignificant to precisely define the genetic makeup of *luteolus. Id.* Put another way, the Louisiana black bears had been hybridized enough that it was hard for the scientists to pin down exactly

10

what combination of black bear genes constituted a pure, native *luteolus* bear. *Id.* These results meant that the effects of crossbreeding between native *luteolus* bears and the Minnesota bears introduced in the 1960s "[did] not seem to be great enough to pose a significant threat to [*luteolus*] genetic integrity by hybridization as speculated [by the Service] at listing." *Id.* Moreover, the study emphasized that "genetic exchange that is occurring among bears from Louisiana, Mississippi, and Arkansas can be considered a positive genetic and demographic contribution to the Louisiana black bear." *Id.* Based on the scientific evidence, the Service again concluded, as it had at the time of listing, that hybridization was not a significant threat to *luteolus*.

After considering hybridization, the Service moved on to the possibility of threats from vehicle collision, illegal killing, and climate change, and concluded that none of these human causes of bear deaths were significant threats to *luteolus*. *Id.* at 13,164–67. As for threats from hurricanes and climate factors, the Service concluded that the bear could survive these events due to its adaptability, mobility, and demonstrated resilience. *Id.* at 13,167.

### iii. Significant portion of the range analysis

Having found that *luteolus* was no longer threatened across its range, the Service finally considered whether there were significant portions of the range where the bear was in danger of becoming extinct or likely to become so in the foreseeable future. *Id.* at 13,168–70. This analysis focused on the coastal LARB subpopulation, which is isolated from other subpopulations geographically and possibly at greater risk due to "additional potential threats from future anticipated development and sea

11

level rise." *Id.* Because the 2014 population study discussed above did not analyze the LARB bears, the Service "did not have data to determine [the LARB subpopulation's] long-term viability." *Id.* at 13,169. The Service ultimately concluded, however, that the LARB subpopulation was not threatened or endangered because "bears have demonstrated the ability to adapt and would likely move into more suitable areas" in the event of rising water levels. *Id.* The effects of higher sea levels would be offset by a projected increase in sedimentation of the Atchafalaya Basin, a process which in theory creates bear habitat where once there was uninhabitable swamp. *Id.* Additionally, loss of the LARB subpopulation would not cause extinction because the majority of the *luteolus* population was found in the TRB and UARB subpopulations, where the likelihood of survival was very high. *Id.*

### F. Plaintiffs' Lawusits

Plaintiffs have filed two lawsuits challenging the 2016 decision to delist *luteolus*. The first was filed in June 2018 in the U.S. District Court for the District of Columbia. (Doc. 1-6 at 1). *See also Public Employees for Environmental Responsibility, et al. v. Bernhardt, et al.*, Case No. 18-CV-1547, 2020 WL 601783 (D.D.C. Feb. 7, 2020) (*hereinafter*, PEER). That case involved all of the same plaintiffs as this action, with the exception of Healthy Gulf. (Doc. 1-6 at 1). The PEER litigation proceeded through summary judgment but was dismissed without prejudice after the Court found that the Plaintiffs lacked standing. *See PEER*, 2020 WL 601783, at *9.

Plaintiffs' second lawsuit is now before this Court. Plaintiffs allege that the delisting of *luteolus* violated the ESA and the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, and ask this Court to order that the bear be returned to the List of

Endangered and Threatened Wildlife and that a New Recovery Plan be adopted. In addition to the Federal Defendants, Safari Club International and the State of Louisiana have intervened as Defendants. Defendants argue first that Plaintiffs still do not have standing and second that the Service's decision to delist *luteolus* was lawful.

## II.    LAW AND ANALYSIS

### A. Plaintiffs Have Standing

For standing in federal proceedings, a party must demonstrate the "triad of injury in fact, causation, and redressability." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998). The injury in fact must be "a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent.'" *Id.* (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990)). Causation requires a "traceable connection" between the plaintiff's injury and the defendant's conduct. *Id.* Redressability requires "a likelihood that the requested relief will redress the alleged injury." *Id.* Where a case involves multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief." *Town of Chester v. Laroe Estates, Inc.,* 581 U.S. 433, 434 (2017). Here, all the Plaintiffs—the individual and the organizational Plaintiffs—seek the same form of relief for each claim. Therefore, if any one of the plaintiffs has standing, the Court can proceed to the merits.

The first hurdle for Plaintiffs is to demonstrate that they have suffered an injury in fact. In an environmental case, this requirement is satisfied if a party adequately shows that it has an aesthetic or recreational interest in a particular place or animal, and that interest is impaired by a defendant's conduct. *See Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000). Although a "generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." *Summers v. Earth Island Inst.,* 555 U.S. 488, 494 (2009); *see WildEarth Guardians v. Jewell,* 738 F.3d 298, 305–06 (D.C. Cir. 2013) (finding that affidavits from environmental groups' members "attesting to those members' aesthetic interests in the land . . . and specific plans to visit the area regularly for recreational purposes" were sufficient to support Article III standing).

Here, Plaintiffs have shown that since delisting, reported annual bear mortality has risen while survival estimates for individual subpopulations have steadily dropped, citing the Service's own Post-Delisting Monitoring Annual Reports. (*See* Doc. 51-8 at ¶ 6). According to the 2019 such report, the average annual reported deaths for Louisiana black bears in Louisiana has been 46 bear deaths per year post delisting, compared to only 16 per year on average during the entirety of the bear's time listed as a threatened species. (*Id.*). Additionally, the female bear survival rate in the UARB has since fallen below the minimum threshold to ensure survival defined by the Service itself. (*Id.* ("The UARB estimate was at or slightly below the minimum threshold [for survivability] . . . .") This data suffices to show that the harm to Plaintiffs' ability to observe and study *luteolus* is actual. *See Aransas Project v. Shaw,* 775 F.3d 641, 648 (5th Cir. 2014) (finding that deaths of whooping cranes left "little doubt" that plaintiffs had suffered actual harm and had standing to sue under ESA).

To establish their interest in the survival of *luteolus*, Plaintiffs have shown

that they have worked to protect *luteolus* and its habitat for decades and have personal and professional interests in observing and studying the bear. (*See, e.g.*, Docs. 51-3 at ¶¶ 4, 8–14 (describing declarant's role in the formation of the Black Bear Conservation Coalition, which is dedicated to restoring *luteolus* and its habitat, ongoing status as a life member in that organization, and time spent "over three decades" studying the Louisiana black bear and visiting and observing its habitat in Louisiana with plans to continue doing so); 51-4 at ¶ 26 (describing desire to observe the bear in its native habitat); ); 51-5 at ¶ 42 (describing aesthetic interest in bear sightings in the Atchafalaya Basin); ); 51-5 at ¶ 9, 14 (describing professional interest in ongoing study of the bear and intent to continue visiting Louisiana to observe the bear)). These declarations establish that the individual Plaintiffs have the requisite concrete interests in the bear's survival to have standing in this case.

Several of the Plaintiffs are conservation and advocacy groups, for whom Plaintiffs seek associational standing. Such standing exists when an entity's "members would otherwise have standing to sue in their own right, the interests at stake are germane to the [entity's] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 (1977)). The organizational Plaintiffs here meet the requirements of associational standing. The purposes of these organizations, as shown by the declarations submitted on their behalf, are conservation and advocacy. These organizations unite

their members in the shared purpose of observing, protecting, and studying *luteolus* and its habitat, among other species and ecosystems in Louisiana and across the country. As just one example, Dean Wilson submits his declaration on behalf of Plaintiff Atchafalaya Basinkeeper and as a member of Plaintiff Healthy Gulf. (51-8 at ¶¶ 1, 4). Mr. Wilson states that Basinkeeper's purpose is to "preserve and restore the ecosystems of the Atchafalaya Basin, including wildlife habitat, and to support the future health and sustainability of the Basin and Louisiana's coast," including specifically to protect the habitat of *luteolus*. (*Id.* at ¶¶ 6, 14).[1] The declarations show that the loss of *luteolus* would constitute a harm to the organizations as entities as well as to each of their members. Nor do the claims asserted or relief requested here require the participation of the organizations' individual members, although some members join the lawsuit as individual Plaintiffs. *See Gulf Restoration Network v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012) ("Because neither the claims nor the relief require individualized proof, they are thus properly resolved in a group context."

---

[1] Intervenor-Defendant Safari Club International (SCI) protests that Plaintiffs have failed to identify specific locations in the *luteolus* range to link their personal use to the specific area affected by the delisting, citing the D.C. District Court's holding that "broad, general assertions will not suffice" for standing. (Doc. 65-1 at 12). Here, the Court notes that SCI is simply incorrect about what Plaintiffs have asserted this time regarding their own interests. For example, Mr. Wilson states that he "regularly visit[s] the following areas that were part of the Service's designated critical habitat (Unit 2) for the Louisiana black bear: (A) Fisher Lake, (B) Bayou Chene, (C) 1-10 canal between the Whiskey Bay Pilot Channel and the Eastern levee, including East Branch of Brown Bayou, and (D) up and down the Atchafalaya River." (Doc. 51-8 ¶ 26). Another example: Harold Schoeffler, a member of Plaintiffs Sierra Club and Louisiana Crawfish Producers Association-West, describes his regular recreation "in the lower Basin between Morgan City and the Bay, between Wax Lake and the Atchafalaya River, between Bayou Sally and Wax Lake, and on the west side of the Basin, including in the Buffalo Cove area (in Unit 2 of designated critical habitat for the bear)." (Doc. 51-7 ¶ 12). It is unclear to the Court how Plaintiffs could be much more specific.

(quotations omitted, cleaned up)). For these reasons, the Court finds that the organizational Plaintiffs also have standing.

With actual injury in tow, all that is left for Plaintiffs is to show causation and redressability, i.e., that the increase in mortality of *luteolus* was fairly traceable to the delisting and that relisting the bear would likely resolve the harm. *See Citizens for a Better Env't,* 523 U.S. at 103. Even in the face of other plausible explanations for the increases in bear mortality and declines in the survival rate of the UARB subpopulation,[2] Plaintiffs' own explanation suffices for causation. Restoring ESA protections to *luteolus* could be reasonably expected to reverse the trends in bear mortality that establish Plaintiffs' harms. Protecting the bear under the ESA led to steady and significant population recovery over a period of 24 years. The Court will assume for standing purposes that such recovery would continue if the bear is relisted. *See Aransas Project,* 775 F.3d at 648 ("Redressability requires a likelihood that the requested relief will redress the alleged injury." (quotations omitted)). For the foregoing reasons, the Court finds that the Plaintiffs have established standing to challenge the Service's delisting of *luteolus* and will proceed to the merits of Plaintiffs' case.

**B. The Delisting Was Not Arbitrary Or Capricious**

Plaintiffs argue that the Service's 2016 delisting of *luteolus* was flawed in five ways: (1) the Service should not have included the UARB in its analysis because the

---

[2] For example, Intervenor-Defendant SCI argues that the increase in mortalities instead shows that the total bear population in Louisiana has also increased, thereby reducing the percentage significance of the higher annual death rate. (Doc. 65-1 at 21).

bears there are not truly native to Louisiana; (2) the Service should have considered the loss of historical *luteolus* range; (3) the Service should have considered the loss of historical *luteolus* population; (4) the Service's analysis of threats to *luteolus* was arbitrary and capricious; and (5) the Service's conclusion that *luteolus* was not threatened in a "significant portion of its range" was arbitrary and capricious and not in accordance with the law. After discussing the applicable law, the Court will consider each argument in turn.

### i.  Standard of Review

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge to an agency action under the Administrative Procedure Act (APA), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Thus, in evaluating a case on summary judgment, the court applies the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001).

In a challenge to agency action brought pursuant to the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)-(D). When reviewing for arbitrariness and capriciousness, a court considers whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Instead, this court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). As Judge J. Skelly Wright put it: "[T]he judicial role . . . is to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1111 (D.C. Cir. 1971).

### ii.  ESA Statutory Requirements

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Under the ESA, the Service must "identify and list species that are 'endangered' or 'threatened.'" *Center for Biological Diversity v. Zinke,* 868 F.3d 1054, 1057 (9th Cir. 2017) (quoting 16 U.S.C. § 1533). A threatened species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C. § 1532(20), while an endangered

19

species is "in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6).

The Service must make listing and delisting determinations according to a five-factor analysis of potential threats, including: (A) the present or threatened destruction, modification, or curtailment of [a species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting its continued existence. 16 U.S.C § 1533(a)(1). The agency must make any determination "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A). The Secretary of the Interior has delegated the authority to determine whether a species is endangered or threatened to the Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

### iii. The Service's Inclusion of the UARB Subpopulation

Plaintiffs' primary challenge is to the Service's inclusion of the UARB bear subpopulation in its delisting analysis. Plaintiffs argue that the UARB bears trace their roots primarily or even solely to the Minnesota bears introduced in the 1960s. For this reason, the modern-day UARB bears are not true, native *luteolus*, and the Service's inclusion of the UARB bears in its consideration of the health of the *luteolus* population in Louisiana was therefore in error. (*See* Doc. 51-1 at 18). Plaintiffs further argue that the ongoing crossbreeding between the UARB and TRB bears represents a threat to *luteolus* that the Service should have considered. (Doc. 51-1 at 27–29). In fact, Plaintiffs argue, the process of introducing bears to the TRC region—located between the UARB and TRB—which the Service undertook in 2001 to strengthen the

20

genetic viability of the subspecies, *see* 81 Fed. Reg. at 13,129, itself represents a threat to the genetic purity of *luteolus*. (Doc. 51-1 at 28). Plaintiffs ask this Court to order the Service to develop a new Recovery Plan that takes into account the risks that crossbreeding poses to the native Louisiana bear. (*See id.*). Plaintiffs also take issue with how the Service determined that a key recovery plan metric— the existence of a corridor between two *luteolus* subpopulations—was met. Because one of the connected subpopulations, the UARB, did not actually have native *luteolus* bears, Plaintiffs argue, no corridor truly connects *luteolus* subpopulations. (*Id.* at 25–27).

After reviewing the administrative record and the parties briefing, and mindful of the "extreme degree of deference" owed to an agency's scientific findings, the Court finds that the Service made a reasonable decision after careful consideration of the best available scientific evidence. *Permian Basin Petroleum Ass'n v. U.S. Dep't of the Interior*, 127 F. Supp. 3d 700, 707 (W.D. Tex. 2015); *see Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) ("[A reviewing court] must look at the decision not as a chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.").

It is apparent that the Service has considered the impact of hybridization on *luteolus* going all the way back to the original rule listing the bear as threatened in 1992. A 1989 study the Service relied on at the time suggested that "a pure strain of [*luteolus*] subspecies no longer existed" because of habitat continuum between the

TRB bears and the Minnesota bears in the UARB, bear releases in Arkansas resulting in dispersal into Louisiana, and the documented long-distance natural movements of bears. 81 Fed. Reg. at 13,165. Crucially, the study also concluded that "encouraging gene flow from nearby populations (including *U. a. americanus*) is one of the best strategies for long term preservation of [*luteolus*]." (Doc. 58-1 at 31). This recommendation drove the Service to encourage crossbreeding between the TRB and UARB subpopulations through the introduction of bears to the TRC. 81 Fed. Reg. at 13,135–36.

Fast forward to 2016, the primary study relied on by the Service in support of delisting also concluded that genetic interchange should be considered "a positive genetic and demographic contribution to the Louisiana black bear." *Id.* at 13,165 (quoting Laufenberg & Clark, *supra*). Additionally, data from successive studies of TRB bears showed that increases in genetic diversity during the listing period contributed to corresponding increases in estimated population size and long-term population viability. *Id.* at 12,129–30. The 2014 study also "found varying levels of genetic structure among pairs of subpopulations and identified five genetically distinct groups." *Id.* at 13,165 (quoting Laufenberg & Clark, *supra*). The study "concluded that differentiation between the Louisiana black bear subpopulations within [Louisiana and Mississippi] can be explained as the result of restricted gene flow, accelerated genetic drift, and differing levels of genetic introgression as a result of the Minnesota introductions." *Id.* In other words, the studies relied on by the Service provided support for its theory, going back to the time of listing *luteolus*, that

the Louisiana black bear population was to some extent already hybridized, and that such hybridization was a good thing for the bear's long-term survival.

Plaintiffs argue that the 2014 study, which found similarities between UARB and Minnesota bears, "fatally undermined" the Service's claims that the Recovery Plan criteria had been met. (Doc. 70 at 10 (referring to Laufenberg & Clark, *supra*). However, numerous problems with Plaintiffs' argument are apparent. First, it represents an incomplete description of the study's findings because the study also found affinities between the UARB and LARB bears and between the TRB bears and bears in Arkansas. (Doc 58-1 at 33). Second, by arguing that UARB bears should not count as *luteolus* and that crossbreeding is a threat, Plaintiffs essentially mount a challenge to the listing of the bear in 1992 and actions taken by the Service during the listing period, throughout which the UARB bears have been considered *luteolus*. These decisions are not under review in this case.[3] Informed by the best available science, the Service has operated under the assumption that the UARB bears are *luteolus* since 1992. No scientific data demands a contrary conclusion. Moreover, once the UARB subpopulation was listed as part of *luteolus* in 1992, a decision that went unchallenged, the Service was required to engage in a "comprehensive review of the

---

[3] Plaintiffs' requested relief includes having this Court supervise the Service's development of a new recovery plan that considers the genetic differences between the UARB bears and other subpopulations. (*See* Doc. 51-1 at 28–29, 50). This presents significant problems of administrability, and this Court is loathe to micromanage the Service's actions in the way Plaintiffs appear to request. (*See id.* at 29 (suggesting that this Court should reverse the introduction of bears to the TRC), 50 (suggesting that this Court revise the Recovery Plan)). Plaintiffs request is short on details, and for good reason: what Plaintiffs propose is that the Court embark on a possibly decades-long supervision of the Service's actions. The Court simply is in no position to oversee the Service—or any executive agency—in this way. *See Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).

entire *listed* species," including the UARB bears. *Humane Society v. Zinke*, 865 F.3d 585, 601 (D.C. Cir. 2017) (emphasis added). Once the UARB bears were listed in 1992, it would have been arbitrary and capricious for the Service *not* to include those bears in its delisting analysis.

Third, and importantly for this Court's purposes, the Service engaged in a reasoned analysis of the same study relied on by Plaintiffs. In contrast to Plaintiffs' assessment of the scientific evidence, the Service came to the following conclusions: the effects of crossbreeding between native *luteolus* bears and the Minnesota bears introduced in the 1960s "do not seem to be great enough to pose a significant threat to [*luteolus*] genetic integrity by hybridization as speculated at listing;" and any "genetic exchange . . . occurring among bears from Louisiana, Mississippi, and Arkansas can be considered a positive genetic and demographic contribution to the Louisiana black bear." 81 Fed. Reg. at 13,165 (citing Laufenberg & Clark, *supra* at 85). These conclusions reflect a reasoned analysis of the best available scientific data. *See State Farm*, 463 U.S. 29, 43 ("[A] court is not to substitute its judgment for that of the agency.").

Furthermore, the case relied on by Plaintiffs is distinguishable from the facts before this Court. In that case, *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244 (D.D.C. 2002), the court reversed as arbitrary the Service's decision to not list a species of fish as endangered. There, the Service had both identified hybridization as the greatest single threat to the fish species and inexplicably "include[d] hybrid fish" in concluding that the fish population was safe from extinction. *Id.* at 253. In contrast, the Service

here acknowledged that hybridization could be a threat but found that some amount of hybridization was already occurring even before *luteolus* was listed. *See* 81 Fed. Reg. at 13,165. Additionally, relying on scientific data, the Service concluded that hybridization was important for the long-term survival prospects of the bear. *Id.* Notably, the *Norton* court faulted the Service for "not explain[ing] how hybridized fish might contribute to the viability of the species" and not "argu[ing] that some degree of hybridization is benign." *Norton*, 193 F. Supp. 2d at 255. Here the Service has done both. *See* 81 Fed. Reg. at 13,165. In sum, the Court finds that the Service engaged in a reasoned analysis of the positive and negative effects of hybridization on the Louisiana black bear. Ultimately, the Service determined that the UARB bears counted as *luteolus*, as they had for decades prior, and that crossbreeding represented a net positive effect for the subspecies. Plaintiffs strongly disagree, but the Court cannot hold that the Service was arbitrary or capricious in reaching these conclusions.

### iv.  The Service Properly Considered Historical Range

Plaintiffs next challenge as inadequate the Service's consideration of the historical range of the Louisiana black bear. (Doc. 51-1 at 29). They argue that the Service "disclaimed the need to consider the loss of historical range" and instead should have "conducted . . . [a] comparative assessment of historical and current ranges" and an analysis of "how much habitat is enough to render *luteolus* no longer threatened, or of how the loss of historical range is affecting the subspecies today." (*Id.*). No such analyses are required by the ESA, and the Court concludes that the Service's analysis of *luteolus* habitat, including its historical range, was reasonable.

The Service has long considered how the reduction in historical range has affected *luteolus*. Indeed, the principal justification for listing the bear as threatened in the first place was the loss of more than 80% of the bear's historical range. Listing Rule at 590–591. Based on this understanding of this threat to *luteolus*, the Service set forth habitat-based metrics to assess the bear's recovery. 81 Fed. Reg. at 13,124 (describing the Service's Recovery Plan). For the Service to consider the bear recovered, two viable subpopulations needed to exist with corridors between the two and long-term habitat protections needed to be in place. *Id.* In essence, the Service's recovery criteria for *luteolus* were set against the backdrop of the Service's consideration of the bear's historical range and the threat presented by its reduction. Guided by these recovery criteria, the Service relied on recent detailed analyses—the best available data—to assess the increases in current range since listing and link those increases to the bear's current survival chances. *Id.*

In *Humane Society v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017), the sole case cited by Plaintiffs in support of the argument that the Service failed to consider historical range, the Service "wrongly omitted all consideration of lost historical range." *Id.* at 605. There, in a challenge to the delisting of segments of the gray wolf population, the court pointed out that "[d]espite immense losses in the gray wolves' historical range," the Service "nowhere analyzed the impact of that loss" on the species' survival. *Id.* at 606. This would not be a fair characterization of the Service's analysis here. To the contrary, as demonstrated above, the Service has engaged in an extensive consideration of *luteolus* range, historical range, and range recovery since

the bear was listed in 1992. *See* 81 Fed. Reg. at 13,154–59. And the Service continued its focus on habitat when it delisted the bear in 2016. For instance, in the delisting rule, the Service noted that "approximately 78 percent of the bottomland forests in Arkansas, Louisiana, and Mississippi had been lost to conversion [to agriculture] at the time of listing." *Id.* at 13,154. In response to a public comment on the proposed delisting rule, the Service expressly noted that "[t]he recovery status of the Louisiana black bear is not contingent upon it occupying a particular portion of suitable habitat within its historical range." *Id.* at 13,152. Instead, the Service's conclusions that *luteolus* had recovered was based on its reasoned analysis of habitat gains since listing. The Service emphasized that "[r]ecent field data demonstrate a significant range expansion by the Louisiana black bear into areas that were unoccupied at the time of listing." *Id.* The Service's consideration of *luteolus* habitat is lengthy and detailed and analyzes multiple factors contributing to habitat gains, including incentive-based private land restoration programs, state and federal land preservation programs, and population declines in current and potential bear habitat. *See id.* at 13,154–58. Additionally, advances in "[geographic information system technology] and remotely sensed data (e.g., aerial and satellite imagery)" allowed "for highly accurate identification and delineation of habitat based on specified characteristics," which in turn provided the Service with a "more consistent and reproducible estimate of [*luteolus*] habitat distribution and trend." *Id.* at 13,154.

For these reasons, the Court finds that the Service "contend[ed] with the implications of massive range loss for the species' . . . threatened status within its

current environment." *Zinke*, 865 F.3d at 606. Indeed, the entire premise of the Service's analysis of *luteolus* habitat throughout the final rule delisting the bear was that historical range loss had been a threat but was no longer so because of habitat gains during the listing period. These habitat gains have been exhaustively detailed by the Service. *See* 81 Fed. Reg. at 13,154–59. The Court will not require the Service to be any more explicit in considering the reduction of historical range.

### v. The Service Properly Considered Historical Population

In the same vein, but citing no case law, Plaintiffs next challenge as inadequate the Service's consideration of the historical population numbers of *luteolus*, arguing that the Service should have compared current and historical population numbers in order to analyze the impact of the loss of historical population on the LBB today, or to determine the minimum population that could support delisting. (Doc. 51-1 at 30).

To the contrary, the Court finds that the Service's conclusions about the viability of the current *luteolus* population were based on its reasonable assessment of the best available scientific evidence, which demonstrated that the bear was viable and more than 95% likely to survive in both the TRB and UARB. 81 Fed. Reg. at 13,135. In view of this evidence, the Court declines to direct the Service toward other means of calculating population size or survival chances and the Court will not disturb the Service's reasoned assessment of the best available scientific evidence. *See Gulf Restoration Network*, 452 F.3d at 368.

### vi. The Service's Threats Analysis

As part of the final rule delisting *luteolus*, the Service extensively discussed each of the five ESA potential threat factors, concluding that each of the threats had

been eliminated or reduced such that listing was no longer necessary. Plaintiffs challenge the Service's conclusions regarding Factor A—threats to the bear's habitat, and Factor D—the adequacy of regulatory protections. For both of these factors, the Court finds that the Service performed a reasoned analysis and properly considered all relevant factors.[4]

First, Plaintiffs argue that the Service's analysis of threats to *luteolus* habitat was arbitrary and capricious, pointing to alleged failures to enforce prohibitions against habitat destruction, the perceived lack of quality habitat gains made during the listing period, and alleged issues with the Service's projections for future habitat gains. (Doc. 51-1 at 32–36).

The Final Rule, however, reveals that the Service did analyze these issues and reached a different conclusion than Plaintiffs regarding the threats to the bear's habitat. For example, the Service's experiences in the field during studies and other management activities contradicted Plaintiffs' assertions about large-scale forest clearcutting and illegal logging. 81 Fed. Reg. at 13,149–50. The Service also responded to concerns about the quality of habitat gains, particularly those in the LARB, by considering evidence that the habitat north of the LARB would convert to

---

[4] In the time between the parties' filings and the issuance of this Order, the State of Louisiana has indicated that it will consider allowing a limited black bear hunt. *See* LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES, NOTICE OF INTENT: BEAR HUNTING AREAS, SEASONS, RULES AND BAG LIMITS (Nov. 2, 2023). This does not change the Court's analysis. As explained in the Final Rule delisting *luteolus*, hunting is only allowed if existing data and simulated population dynamics models indicate hunting is compatible with the bear's long-term survival. 81 Fed. Reg. at 13,152. The Court finds that the Service did not arbitrarily or capriciously conclude that these and other safeguards were adequate to protect the bear.

suitable habitat over the next decades, which would "improve habitat linkages and genetic exchange between [the LARB and UARB bears]." *Id.* at 13,158. For these reasons, the Court finds the Service's analysis was rational. Simply put, Plaintiffs' disagreement with the Service's conclusions on these points does not render the Service's conclusion arbitrary and capricious. *Sabine River Auth. v. U.S. Dep't of Interior,* 951 F.2d 669, 678 (5th Cir. 1992) ("Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence.").

Second, Plaintiffs argue that the Service improperly relied on inadequate state plans for *luteolus* protection. In particular, Plaintiffs contend that the mechanisms for protecting the black bear on the state level predated the listing, are not consistently implemented, exclude significant bear survival needs, or are otherwise inadequate. (Doc. 51-1 at 36–37). Again, however, the Court finds that the Service engaged in a reasoned consideration of the existing regulatory mechanisms to arrive at its conclusions.

In determining the adequacy of regulatory mechanisms, the Court must consider whether the Service's analysis could lead to the rational conclusion that the state's regulatory mechanisms are adequate to sustain a recovered *luteolus* population. *See Greater Yellowstone Coal., Inc., v. Servheen,* 665 F.3d 1015, 1032 (9th Cir. 2011) ("It is reasonable to conceive of 'adequate' regulatory mechanisms as offering a recovered species something less than the stalwart protections of the ESA, but considerably more than no special protection at all.").

Here, the Service engaged in a lengthy analysis of multiple levels of state and federal legal protections that will serve to protect the Louisiana black bear into the future. 81 Fed. Reg. at 13,160–64. These include state-implemented management plans in Louisiana, Mississippi, and Texas designed specifically for the protection of the black bear; habitat protection and acquisition programs on state-owned lands; habitat protection and conservation activities in National Wildlife Refuges; the Army Corps of Engineers' Atchafalaya Basin Multipurpose Plan aimed at "retaining and restoring the unique environmental features and long-term productivity of the Basin"; large land acquisitions by the Corps in bear habitat which established permanent protections against future development or conversion; permanent conservation easements on private lands in bear habitat; Food Security Act Regulations that protect against wetland conversion, and numerous other governmental protections. *Id.* As before, the Service's evaluation of the existing regulatory mechanisms was adequately reasoned, and its conclusion that the regulatory mechanisms would sufficiently protect the Louisiana black bear was not arbitrary and capricious.

### vii.  The "Significant Portion of Its Range" Analysis

Plaintiff's final challenge is to the Service's analysis of whether *luteolus* is in danger of extinction or likely to become so throughout a "significant portion of its range," which is one way the ESA requires the Service to consider whether a species is "endangered" or "threatened." 16 U.S.C. §§ 1532(6), (2). First, Plaintiffs argue that the Service should have concluded that the LARB subpopulation was significant

because the UARB subpopulation should not count as true *luteolus*.[5] (Doc. 51-1 at 42–43). The Court has already addressed that argument and rejected it. *See supra*, Section II(B)(3). The Service made a reasoned analysis of the evidence before it both when *luteolus* was listed and delisted to conclude that the UARB bears are *luteolus*. Second, Plaintiffs argue that the Service was arbitrary and capricious in concluding that the LARB was not threatened. Again, however, the Court finds that Plaintiffs merely disagree with the Service's reasoned conclusions. Although the Service acknowledged that the information before it regarding the LARB was less robust than the studies of the UARB and TRB, and that the LARB likely faced more threats than the other subpopulations, it still reasonably concluded, based on the best available scientific evidence, that the LARB was not threatened. 81 Fed. Reg. at 13,130. The LARB contains the second largest *luteolus* population. *Id.* The bear population in the LARB had doubled in size in the ten years prior to delisting and was estimated to still be growing at the time of delisting. *Id.* Additionally, the LARB habitat has grown over time and likely will continue to grow as sedimentation creates additional land suitable for bear habitat. *Id.* at 13,131. For these reasons, the Service's conclusion that *luteolus* is not threatened or endangered in the LARB was not arbitrary and capricious.

In sum, based on the administrative record in this case, the Court cannot find

---

[5] In finding that the LARB was not significant, the Service relied on a definition of "significant" that has since been vacated by multiple district courts. *See, e.g., Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 93–96 (D.D.C. 2020). This does not doom the Service's conclusion, however, because it also found that the LARB subpopulation was not threatened. 81 Fed. Reg. at 13,169.

that the Service's decision to delist *luteolus* was arbitrary or capricious or not in accordance with the law. The Court commends Plaintiffs' extraordinary efforts in defense of this remarkable mammal. Would that every species received the same indefatigable support as the Louisiana black bear.

### III.    Conclusion

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 51) be and is hereby **DENIED**. Judgment will enter in favor of Defendants.

**IT IS FURTHER ORDERED** that the Federal Defendants' Cross Motion for Summary Judgment (Doc. 58), Intervenor Defendant Safari Club International's Cross Motion for Summary Judgment (Doc. 65), and Intervenor Defendant State of Louisiana's Motion for Summary Judgment (Doc. 64) be and are hereby **GRANTED**.

Judgment will enter separately.

Baton Rouge, Louisiana, this 29th day of January, 2024

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**